**Robert C. BOUTEN, Appellant (81–712), Respondent (81–501),**

v.

**RICHARD MILLER HOMES, INC., et al., Respondents (81–712), Appellants (81–501).**

Nos. 81–501, 81–712.

Supreme Court of Minnesota.

July 16, 1982.
Rehearing Denied Aug. 31, 1982.

Doherty, Rumble & Butler, Bruce E. Hanson and Alan I. Silver, St. Paul, for Richard Miller Homes, Inc., et al.

Edward Galbraith, Minneapolis, for Bouten.

KELLEY, Justice.

Respondent, Robert C. Bouten (Bouten), brought suit in Hennepin County District Court against appellant Richard Miller Homes, Inc. (Homes Inc.) alleging breach of contract for the sale of realty and the erection of a house thereon, and against appellant Richard Miller (Miller) alleging tortious interference in the business relations and the contract allegedly existing between respondent Bouten and Homes, Inc.[1] The trial court submitted the case to the jury on a special verdict. Adopting the answers given by the jury to interrogatories on the special verdict, the court found that a contract between respondent and Homes Inc. was entered into in June 1978; that Homes Inc. breached that contract; that Miller intentionally and without justification interfered with respondent's contract rights; that such interference was a direct cause of damage to respondent Bouten; and that Bouten's damages flowing from the breach of the contract by Homes Inc. were $7,793, and his damages flowing from the tortious interference by Miller were $14,000.[2] Appellants then moved for judgment notwithstanding the verdict, or, in the alternative, for a new trial. The first motion was denied, but the motion for new trial was denied provided respondent agree to a reduction in the order for judgment against

1. The original complaint asked for specific performance of the alleged contract, but that claim was abandoned prior to and at the time of the trial. Thereafter, the action proceeded as one at law for damages.

2. The first three interrogatories on the special verdict related to similar claims of the plaintiff against the defendants arising out of an agreement made in 1977. The jury found Miller did not tortiously interfere with that agreement and accordingly the other two interrogatories with reference thereto went unanswered.

appellant Miller from $14,000 to $7,000. Respondent did so agree. Appellants appeal from those orders. Respondent filed a notice of review of the remittitur. We reverse.

Since the judgment entered against the appellants rests on the finding that the parties entered into a contract in June 1978, the judgment against appellant Homes Inc. for breach of contract cannot stand if there was no enforceable contract in existence. If there was a contract, unenforceable in an action for damages because of non-compliance with the Statute of Frauds, the action against Miller for tortious interference therewith might still be maintained if there existed any evidence to sustain the claim. Since we hold that oral purchase agreement offered to convey an interest in real estate violated the Statute of Frauds (Minn.Stat. § 513.05 (1980)), it is necessary to state in detail the facts concerning on-going negotiations between the parties over an extended period of time as well as the rulings of the trial court and the instructions given by it to the jury.

In March 1977, respondent Bouten paid Homes Inc. a $100 "lot reservation" fee for a lot in Timber Lakes development in Eden Prairie. Appellant Miller is president and sole shareholder of Homes Inc. Respondent initially dealt mainly with Larry Miller and Claude Johnston.[3] Various negotiations took place during that summer resulting in a purchase agreement offer drafted and signed by Bouten and Johnston. The various purchase agreement offers all contained a clause "this sale is made subject to the approval by the seller of said premises, in writing." As a result of a number of events which transpired during that summer, in the fall respondent sought and obtained a cancellation agreement and release, and his lot reservation fee and earnest money deposit were returned to him by Homes Inc.

The following spring respondent again became interested in buying a lot and home in Timber Lakes. On June 18, 1978, he met with Miller to discuss the purchase. Although disputed, the jury found Miller and Bouten agreed on terms which called for a price of $137,000 including the contingency of respondent securing a first mortgage commitment of $80,000 and $20,000 more in secondary financing. Johnston then prepared a purchase agreement offer incorporating those terms which Bouten signed. This purchase agreement offer provided: "This offer is contingent upon the Buyer securing the mortgage herein specified, and if not, this offer is null and void." It further provided that the "sale is made subject to the approval of seller, in writing" and stated that the agent could not bind the seller and was not personally responsible except to return earnest money if the transaction failed to reach fruition.

Thereafter, during the summer of 1978, respondent attended decorators meetings and made application for the first mortgage called for in the purchase agreement offer. At Johnston's suggestion, respondent applied to Northland Mortgage Company (Northland) and received from it on August 16, 1978 a written mortgage commitment. The mortgage commitment stated that "there can be no secondary financing at the closing of the [mortgage loan]." At the time of the commitment, Northland had not been informed of the proposed second mortgage.[4] Northland had a policy that it would not issue a mortgage commitment in connection with any transaction where there was to be secondary financing. Moreover, its policy was that even though secondary financing was obtained later by an applicant-borrower, Northland would not

---

**3.** Larry Miller, appellant Miller's brother, was sales manager of Homes Inc. and after January 1, 1978 its vice president. Claude Johnston was a "builder representative" selling exclusively for Homes Inc. Although there was some dispute about his relationship to the corporation, for the purpose of this opinion we consider he was an agent of Homes Inc.

**4.** Attached to the purchase agreement offer was Addendum "Zero." This addendum contained the financing arrangements. Respondent, when he applied for the mortgage from Northland, personally took the purchase agreement offer to the company but he did not submit Addendum "Zero."

grant mortgage funds if it knew in advance that secondary financing would be obtained by the borrower.

When Northland issued its mortgage commitment letter, the June 18, 1978 purchase agreement offer had not been accepted on behalf of Homes Inc., although the offer expressly stated the sale was subject to approval of the seller, in writing. No one had signed on behalf of the seller. It was the practice at Homes Inc. that Miller was the only one who could approve purchase agreement offers for the corporation. He customarily reviewed such offers before accepting only after a potential borrower had obtained financing and removed all contingencies.

After receiving Northland's commitment letter, Miller noted that it prohibited secondary financing. Since the purchase agreement offer—especially Addendum "Zero"—called for such financing, he called Richard Hafner, vice president of Northland, to see if Northland would waive the secondary financing prohibition. Northland's position, consistent with its general policy, was there could be no secondary financing. Miller then attempted to persuade Northland to increase the loan commitment without success. Following this conversation with Northland, Miller called respondent to inform him that the "deal was off" because of Northland's refusal to permit secondary financing in spite of his efforts to get a waiver. At that time, Bouten became angry with Miller and swore at him. Thereafter, respondent proposed another offer eliminating the secondary financing, but this offer was refused by Homes Inc., apparently because of respondent's attitude on the telephone. In October 1978, Homes Inc. tendered to respon-

dent the earnest money deposit and lot reservation fee which respondent then refused, and instead this action was commenced.

At the trial, respondent claimed he and Miller, on behalf of Homes Inc., entered into an oral contract for the sale of an interest in land on June 18, 1978. Appellants took essentially two positions: first, that the oral agreement between respondent and appellant Miller on June 18, 1978 did not constitute an enforceable contract because it did not comply with the requirements of the Statute of Frauds; and second, that there was never a meeting of the minds because the purchase agreement offer drawn by Johnston expressly provided for contingencies which were not satisfied and for acceptance by the seller, Homes Inc., in writing.

At the conclusion of the trial and before argument and instructions, appellants moved for a directed verdict which motion was denied. Moreover, appellants requested that the jury be given an instruction concerning application of the Statute of Frauds which was likewise denied.[5] Thereafter, the trial judge instructed the jury that a contract for the sale of real estate contained three elements—an offer, acceptance and a meeting of the minds. The court did not instruct that the contract had to be in writing. After the jury had commenced deliberations, it requested additional instructions concerning the definition of contract and specifically asked if the acceptance had to be written or whether it could be "verbal." The court then, in the absence of counsel,[6] instructed the jury that it could be verbal. In a memorandum attached to the order denying appellants' motion for judgment notwithstanding the ver-

---

5. Defendants requested Instruction No. 3 read:
   STATUTE OF FRAUDS—Minnesota Statutes § 513.05, in part, provides: "Every contract . . . for the sale of land . . . shall be void unless the contract . . . is in writing and subscribed by the party by whom the sale is to be made . . . ." Thus, a contract for the sale of land is void if it is not in writing and signed by the seller, unless some other written memorandum is signed by the seller and describes the land to be sold, the parties and the general terms and conditions of sale.

The seller's signature must be on a writing containing the essential elements of the agreement. If you find that the purchase agreement offer dated June 18, 1978, was not signed by Richard Miller Homes, Inc., then you must find for defendants even if you believe the parties had reached an oral agreement.

6. Apparently all counsel had left the courtroom after the jury retired to deliberate.

dict and the findings of the court, the trial court explained that, in his opinion, the June 1978 agreement was removed from the statute by part performance.

■ In our view, the "contract," whether it be considered the oral conversation between respondent and Miller on June 18, 1978 or the subsequent purchase agreement offer, does not meet the requirements of the Statute of Frauds, Minn.Stat. § 513.05 (1980).[7] In *Greer v. Kooiker*, 312 Minn. 499, 253 N.W.2d 133 (1977), we stated that in order to satisfy the Statute of Frauds there must be a writing containing (1) a statement of the consideration; (2) an adequate description of the parties; (3) an adequate description of the land; (4) the general terms and conditions of the transaction; and (5) subscription by the vendor. It is obvious the oral conversation in June between respondent and Miller does not satisfy the requirements of the statute. The written purchase agreement offer meets all of those requirements except subscription by the vendor, Homes Inc.[8] A subscription is the same as a "signing." 2 A. Corbin, *Contracts* § 521; 4 S. Williston, *A Treatise on the Law of Contracts* § 585 (3d ed. 1961); *Radke v. Brenon*, 271 Minn. 35, 40, 134 N.W.2d 887, 891 (1965).

In certain circumstances, this court has dispensed with literal compliance with the Statute of Frauds to further the purpose of the statute. Thus, in *Greer*, an action in equity for specific performance, the court relied upon parole evidence and judicial notice to perfect the description of the land and the statement of the consideration. *See also Doyle v. Wohlrabe*, 243 Minn. 107, 66 N.W.2d 757 (1954), also an action in equity for specific performance. However,

in both of those cases, the missing or ambiguous terms could be supplied from undisputed facts elicited at the trial. In this case, however, the critical fact in dispute is whether Homes Inc. accepted the offer of Bouten. Since the purchase agreement offer provided that it must be accepted in writing, and since the statute provides that the writing must be subscribed by the vendor, this critical element could not be ascertained from undisputed facts elicited at the trial.

Respondent contends there are equitable considerations present in this case which, in effect, amount to part performance which would remove the contract from the requirements of the statute. He claims persons dealing with Homes Inc. are led to believe that they will hear about problems with the purchase agreement offer within several days; and that such purchasers are encouraged and required to invest time and expense in securing financing and planning the fine details of the home to be built. Respondent then claims that when all this has been accomplished, the purchaser's investment in time and money is at the mercy of Homes Inc. which is then free to determine, at that late date, whether the proposed transaction is in its best interests.

Admittedly, those contentions have some appeal. However, the major problems with arguing that such equitable principles can be used to avoid the statutory requirements are that (1) the argument has only been recognized in actions for equitable relief,[9] and (2) a customary prerequisite of relief has been part performance.

■ We have held that an action at law for damages based upon breach of an

---

7. Minn.Stat. § 513.05 (1980), insofar as relevant, states:

Every contract * * * for the sale of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party by whom * * * sale is to be made * * *.

8. Johnston's signature on the purchase agreement offer is inadequate to satisfy the statute because it is undisputed from the evidence he lacked written authorization to convey land

belonging to Homes Inc. Both respondent and Johnston acknowledged that at the time the purchase agreement offer was submitted, they knew that only Richard Miller could sign the acceptance for the seller, Homes Inc.

9. As previously indicated, originally, in his complaint, respondent asked for specific performance—equitable relief. The record is silent as to why his prayer for specific performance was dropped prior to trial.

oral contract to convey real estate cannot be successfully prosecuted even though there is sufficient consideration for, and part performance of, the contract. *In re Estate of Hallock*, 221 Minn. 30, 20 N.W.2d 884 (1945). *See also* 2 A. Corbin, *Contracts* § 422. Moreover, the doctrine of part performance ordinarily can be successfully invoked if the vendee took possession of the land and made valuable improvements thereon. *Hatlestad v. Mutual Trust Life Insurance Co.*, 197 Minn. 640, 268 N.W. 665 (1936). Usually the payment of purchase money is insufficient, but payment of consideration may be sufficient if provided through personal services which would be hard to value. *Svanburg v. Fosseen*, 75 Minn. 350, 78 N.W. 4 (1899); *Trebesch v. Trebesch*, 130 Minn. 368, 153 N.W. 754 (1915).

However, in this case respondent does not seek equitable relief. He seeks damages, not only for restitution but also consequential damages arising out of reliance and expectation interests. In our view, the contract under which respondent sued was within the ambit of the Statute of Frauds. Since it was not subscribed in writing by the seller, it cannot form the basis of an action at law for damages. Since there was no legally enforceable contract, appellant Homes Inc. is not liable for damages caused by breach of any oral contract between Miller and respondent.

■ Appellant Miller is alleged to have intentionally and without justification interfered with the "contract rights" respondent allegedly acquired in 1978. We set forth the elements of the tort of intentional interference with contract in *Royal Realty Co. v. Levin*, 244 Minn. 288, 69 N.W.2d 667 (1955):

> Recovery may be had for inducing breach of contract by establishing (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom.

*Id.* at 292, 69 N.W.2d at 671. Even if a contract is void because it fails to meet the requirements of the Statute of Frauds, the interfering party may still be liable for inducing the breach of the contract. *Id.* at 292–3, 69 N.W.2d at 671. Here, however, there was no contract. The purchase agreement offer expressly provided it would be void if mortgage financing was not obtained and expressly provided the seller had to accept the offer in writing. Neither event occurred. Moreover, there was complete lack of evidence from which the jury could conclude that Miller committed acts outside the scope of his duties as president of Homes Inc. Officers of a corporation may not be held personally liable for interference with a contract merely for causing the corporation not to perform the contract. *Wilson v. McClenny*, 262 N.C. 121, 136 S.E.2d 569 (1964). *See also Terry v. Zachry*, 272 S.W.2d 157 (Tex.Civ.App.1954); Annot., 26 A.L.R.2d 1227 (1952).

■ The only evidence in this case concerning Miller's actions causing Homes Inc. not to proceed with the alleged contract was (1) his inspection of the June 18, 1978 purchase agreement offer and Northland's commitment letter; (2) his call to Richard Hafner of Northland in September to attempt to get a waiver of the "no secondary financing" restriction on the commitment or to get the amount of the commitment increased; (3) upon failure to do either, his decision not to accept the purchase agreement offer; and (4) his telephone call to Bouten informing him the corporation could not accept the purchase agreement offer because no valid financing had been obtained. In all of these actions, he was proceeding within the scope of his duties as president of Homes Inc. His attempt to get Northland to modify its position so the contract could be consummated by Homes Inc., and, upon failure, his decision not to accept the offer were actions taken beneficial to the corporation. Moreover, respondent contends whatever contract may have existed was made by Miller on behalf of the corporation. In connection with this tortious interference claim, respondent takes a different position—to wit, that Miller was acting outside the scope of his duties as president

of Homes Inc. With respect to the tort of interference with contractual relations, a breach by the defendant of his own contract with the plaintiff is not actionable. W. Prosser, *The Law of Torts* § 129 (4th ed. 1971); *Kiyose v. Trustees of Indiana University*, 166 Ind.App. 34, 333 N.E.2d 886 (Ind.App.1975). The only allegation made by respondent that Miller took actions outside the scope of his duties as an officer of Homes Inc. was that in 1977 he had interfered with Bouten's marriage. The evidence is very equivocal on this point, but assuming he did, that happened in 1977 and was irrelevant to events in 1978. Moreover, when the jury found that Miller had not tortiously interfered with the 1977 contract it, in effect, found the alleged marriage interference not to constitute intentional interference with respondent's contract rights without justification. Ordinarily, justification is a question for jury resolution, 45 Am.Jur.2d *Interference* § 27 (1969), but respondent produced no evidence that Miller acted outside the scope of the best interest of the corporation or with malice for his own personal interest.

Reversed.