**Gale K. NORDLING, Appellant,**

v.

**NORTHERN STATES POWER COMPA-NY, et al., Respondents (C7–90–1499),**

**Jack F. Sjoholm, et al., Respondents (CX–90–1500).**

**Nos. C7–90–1499, CX–90–1500.**

Court of Appeals of Minnesota.

Jan. 15, 1991.

Review Granted March 18, 1991.

James H. Kaster, Nichols, Kaster & Anderson, Minneapolis, for appellant.

Robert R. Reinhart, Melissa Raphan, Oppenheimer, Wolff & Donnelly, Minneapolis, for respondents.

Considered and decided by KALITOWSKI, P.J., and NORTON and FLEMING *, JJ.

## OPINION

NORTON, Judge.

Appellant, Gale K. Nordling, initiated this action against respondents Northern States Power Company and David McGannon, alleging, *inter alia*, breach of employment contract, retaliatory discharge in violation of Minn.Stat. § 181.932, and tortious interference with contract arising out of his discharge as corporate counsel for Northern States Power Company. Appellant initiated a second action, also arising out of his discharge, against Northern States Power Company and respondent Jack F. Sjoholm, alleging, *inter alia*, tortious inter-

---

* Retired judge of the district court, acting as judge of the Court of Appeals by appointment

ference with contract. The district court granted summary judgment in respondents' favor on the breach of contract and tortious interference with contract claims, finding these claims precluded under the general rule that a client has an absolute right to discharge an attorney without liability for breach of contract. The district court also granted summary judgment in respondents' favor on the retaliatory discharge claim on the grounds that appellant produced insufficient evidence to support a cause of action under Minn.Stat. § 181.932. This court consolidated the appeals in both actions.

## FACTS

On appeal from the district court's grant of summary judgment, we view the facts in the light most favorable to appellant. Appellant, Gale K. Nordling, was hired by respondent Northern States Power Company (NSP) as an engineer in 1971 and was employed in this capacity while he attended law school. NSP contributed part of Nordling's law school tuition in exchange for his promise to work for NSP as an attorney following his graduation. Nordling joined the NSP Law Department in the position of corporate attorney after he was admitted to the bar in 1975.

As corporate attorney, Nordling worked primarily with NSP's engineering departments. His responsibilities included contract drafting and negotiation related to the utility business, including construction of NSP's utility plants.

Nordling worked successfully as corporate counsel. During his tenure with NSP, he consistently received above average performance ratings. In 1987, he was rated as a "commendable" employee, "commendable" being defined in NSP's rating system as

> an employee who *consistently* meets all his objectives and contributes to departmental or team productivity *above* that

pursuant to Minn. Const. art. VI, § 2.

which would normally be expected of a fully competent employee.

Nordling made numerous contributions to the company beyond his employment responsibilities. While employed by NSP's Engineering Systems Department, Nordling, with significant expenditure of his own time, developed and provided to NSP for no additional compensation a valuable computer program. As corporate counsel, Nordling worked many extra hours at no additional compensation to develop NSP teaching materials. Nordling also worked on behalf of NSP as an arbitrator for the Minnesota Better Business Bureau without separate compensation. He served on various NSP boards and committees and spoke at public forums and industry-related seminars without separate compensation.

In early 1987, the NSP Law Department was involved in preparations for proceedings before the Public Utility Commission (PUC) to seek approval of electricity rate increases. A major component of the rate increase request was the $1 billion cost of construction of "SherCo III," a new electrical power generation facility located in Sherburne County. In preparation for PUC review of NSP's rate increase request, the Law Department set up a task force for the purpose of anticipating and preparing appropriate responses to potential PUC questions about expenditures for construction of SherCo III. As part of its work, the task force consulted with an attorney in private practice to determine what internal reviews or investigatory steps NSP might take to satisfy the PUC that no significant construction funds had been wasted or misappropriated.

In March 1987, David McGannon, then NSP's Vice President of Law, informed Nordling that the private attorney was orchestrating a personal lifestyle investigation of NSP employees working at the SherCo III power plant. It was Nordling's understanding, from his conversation with McGannon, that the private attorney's plan would involve surveillance of employees on the job site and at their homes. Nordling believed such surveillance was not justified and would constitute an invasion of the employees' privacy. He therefore voiced his objections to McGannon and to Gary Johnson, then NSP's Director of Law.

When McGannon did not indicate that he would stop or impede the plan, Nordling reported to John Noer, General Manager of Plant Engineering and Construction, his conversation with McGannon. Noer, in turn, reported the plan to NSP Vice President Roland Jensen and to James Kettner, SherCo III Project Manager.

Kettner voiced his strenuous objection to the plan to Johnson and accused him of being involved. Although Kettner refused to disclose the source of his information, Johnson assumed it was Nordling. Johnson reported to McGannon his conversation with Kettner and told McGannon that he suspected Nordling as Kettner's source of information.

In response to Noer's information, Jensen reported the matter to his superior, Dennis Gilberts, Senior Vice President of NSP. Gilberts reported the matter to NSP's Chief Executive Officer, James Howard. A meeting took place between Jensen, Gilberts and Howard, and Howard made the decision to stop whatever investigatory work the private attorney was planning.

In April 1987, McGannon began monitoring Nordling's phone messages and personally returning Nordling's incoming calls allegedly because McGannon felt that Nordling was working on nonwork matters during the day. McGannon monitored the calls to determine whether they were from NSP personnel or from others. McGannon also maintained that Nordling was spending an inordinate amount of time out of the office without indicating on the Law Department's call/message board where he was going.

McGannon sent Nordling a memorandum, dated April 9, 1987, informing him that the messages he left on the call/message board were "insufficient." McGannon included a detailed list of Nordling's alleged "deficiencies" in complying with a February 19, 1987 memorandum that instructed Law Department personnel on use of the call/message board. McGan-

non's memorandum to Nordling also instructed him to adhere to certain conditions in order to correct his deficiencies and threatened to place him on "Positive Discipline" if he failed to do so. (See discussion below regarding "Positive Discipline.")

Nordling met with McGannon shortly after receiving the memorandum. Nordling was perplexed and somewhat angered by the memorandum, as he perceived the criticism as unwarranted. At the end of the meeting, McGannon retracted the memorandum and indicated that he would destroy it.

On November 30, 1987, David McGannon discharged Nordling from his position without notice or warning. McGannon's stated reasons for terminating Nordling included his belief that Nordling was "unhappy" and his "unhappiness" affected his relationships with others in the Law Department, including McGannon. McGannon alleged that Nordling did not say "good morning, good night, how are you" and impeded lunch meetings between Law Department personnel.

McGannon also claimed to have relied on specific statements made by Jack F. Sjoholm in reaching his decision to terminate Nordling. Both Sjoholm and Johnson reported to McGannon that Steve Larsen, an NSP employee, had related to them a conversation he had had with Nordling. Larsen allegedly came to see Johnson in his office about a legal matter. Johnson's door was closed because he was in a meeting. Nordling allegedly told Larsen that he should "barge right in" because Johnson was not working anyway, so Larsen would not "interfere with a thing." Larsen testified that incident in question never took place.

Sjoholm also related to McGannon, at an October 1987 meeting, that he had overheard Nordling telling Nordling's secretary, Barbara Tiemann that McGannon and Johnson could not be trusted. Tiemann testified that Nordling never made such a statement.

As a NSP employee, Nordling received a copy of the NSP Employee Handbook and was subject to a policy called "Positive Discipline." The handbook describes "Positive Discipline" as:

a company-wide, uniform policy which covers job performance and commitment for all NSP employees. * * * It provides a system to recognize and communicate good performance and gain commitment to change inappropriate behavior.

\* \* \* \* \* \*

The three formal steps of the Positive Discipline system are:

1. Oral Reminder
2. Written Reminder
3. Decision Making Leave—(day off with pay for you to decide your commitment to the job).

Should * * * informal coaching and counseling and the three formal steps of Positive Discipline fail to bring about appropriate behavior, an employee may be terminated.

*Policies and Practices* at 10, NSP Employee Handbook (1984). The handbook also provided eight specific examples of types of conduct that could result in disciplinary action and discharge from the company. None of the "Positive Discipline" steps were applied to Nordling prior to his discharge.

## ISSUES

1. Did the district court err by ruling as a matter of law that Nordling's status as in-house counsel precludes wrongful discharge claims against NSP?

2. Did the district court err in granting summary judgment in respondents' favor on Nordling's tortious interference with contract claims?

## ANALYSIS

A district court may grant summary judgment if the pleadings and other documents before the court "show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law." Minn.R.Civ.P. 56.03. On appeal from a summary judgment, it is the function of this court to determine whether there are any genuine

issues of material fact and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium,* 281 N.W.2d 328, 330 (Minn.1979).

Before addressing the merits of this case, we note the role of the Minnesota Court of Appeals within the state's judicial system:

> The Court of Appeals is an intermediate appellate court. It is primarily decisional and error correcting rather than a legislative or doctrinal court. Its primary function is the correction of error by application of legal principles. Its task is to find the law, to state it and to apply it to the facts. Only when there are no statutory or judicial precedents to follow will the Court of Appeals make new law.

Minn.Ct.App. Internal R. 1.

## I.

■ It is well settled in Minnesota and in all other jurisdictions that a client may discharge an attorney with or without cause. *See, e.g., Lawler v. Dunn,* 145 Minn. 281, 284, 176 N.W. 989, 989 (1920) (citations omitted); *see also* Minn.R.Prof. Conduct 1.16 & comment (incorporating the general rule). Upon discharge, the client is liable, under the theory of quantum meruit, for payment of services rendered. *Trenti, Saxhaug, Berger, Roche, Stephenson, Richards & Aluni, Ltd. v. Nartnik,* 439 N.W.2d 418, 420 (Minn.App.1989) (citing *Lawler,* 145 Minn. at 284–85, 176 N.W. at 990), *pet. for rev. denied* (Minn. July 12, 1989). The client does not, however, incur liability for breach of contract. *Meagher v. Kavli,* 251 Minn. 477, 492, 88 N.W.2d 871, 882 (1958).

> The discharge of the attorney by [a] client does not constitute a breach of the contract [between the attorney and client], because it is a term of such contract, implied from the peculiar relationship which the contract calls into existence, that the client may terminate the contract at any time with or without cause. * * * [I]t follows from this rule, by necessary implication, that if the client has the right to terminate the contract, [the client] cannot be made liable in

damages for doing that which under the contract [the client] has a right to do. *Lawler,* 145 Minn. 281, 284, 176 N.W. 989, 990 (1920) (citing *Martin v. Camp,* 219 N.Y. 170, 174, 176, 114 N.E. 46, 48 (1916)). The client's unfettered right to discharge an attorney is deemed necessary because of the confidential nature of the relationship between attorney and client and the evil that would be engendered by friction or distrust. *State v. Smith,* 260 Minn. 405, 416, 110 N.W.2d 159, 167 (1961) (citing *In re Lachmund's Estate,* 179 Or. 420, 429, 170 P.2d 748, 752 (1946)).

■ Nordling argues that the rule stated in *Lawler* and its progeny has no application to an in-house attorney as the in-house attorney's only client, the corporation, defines his or her entire professional life, controlling the hours worked, the nature of the work performed, the compensation paid, and the focus and development of the attorney's practice. We disagree.

The Minnesota appellate courts have not yet had occasion to decide applicability of the general rule to in-house counsel. We find a decision by the Appellate Court of Illinois instructive. In *Herbster v. North Am. Co. for Life & Health Ins.,* 150 Ill. App.3d 21, 103 Ill.Dec. 322, 501 N.E.2d 343 (1986), *appeal denied* 114 Ill.2d 545, 108 Ill.Dec. 417, 508 N.E.2d 728, *cert. denied* 484 U.S. 850, 108 S.Ct. 150, 98 L.Ed.2d 105 (1987), the plaintiff, Robert W. Herbster, brought a retaliatory discharge suit against his employer, North American Company for Life and Health Insurance. The suit was premised on Herbster's refusal to destroy documents subject to discovery in a lawsuit pending against North American. Herbster was employed under an oral agreement, terminable at will, in the position of North American's chief legal counsel and vice president in charge of the legal department.

The trial court granted summary judgment in favor of North American, finding no cause of action for retaliatory discharge by an attorney who is terminated by a client. The Appellate Court of Illinois declined to extend the tort of retaliatory discharge to in-house counsel and affirmed

the trial court's grant of summary judgment against Herbster.

Herbster argued that the general rule allowing a client an unfettered right to terminate an attorney with or without cause did not apply because he was "only an employee" of North American. *Id.* 150 Ill.App.3d at 26, 103 Ill.Dec. at 325, 501 N.E.2d at 346. Herbster argued that his relationship with the corporation "was of a permanent nature unlike the usual attorney-client relationship" because he was a salaried employee; he was employed only by the corporation; he owed duties to the corporation's directors, shareholders and officers; and his work was subject to review by his supervisors. *Id.*, 103 Ill.Dec. at 325, 501 N.E.2d at 346. Further, Herbster looked to North American for career development and job security as well as for compensation. *Id.*, 103 Ill.Dec. at 325, 501 N.E.2d at 346.

The court was unable to separate Herbster's role as an employee of North American from his profession.

> Unlike the average employee, plaintiff was a registered attorney subject not only to North American's review but also, like other attorneys, subject to disciplinary review and the Code of Professional Responsibility. * * * Plaintiff's duties were legal in nature and his relationship with his profession as an attorney was and will continue to be pervasive.

*Id.* 150 Ill.App.3d at 26–27, 103 Ill.Dec. at 325, 501 N.E.2d at 346. The court also emphasized the unique position that attorneys occupy vis-à-vis their clients. The confidential nature of the relationship makes trust between attorney and client essential. Thus, the client must have absolute authority to fire the attorney, especially when a breakdown of trust occurs. *Id.* at 28, 103 Ill.Dec. at 326, 501 N.E.2d at 347.

We find the reasoning of *Herbster* persuasive and agree with the Appellate Court of Illinois that the general rule allowing a client to discharge an attorney without liability for breach of contract applies to in-house counsel.

Nordling's relationship with NSP was different from the usual attorney-client relationship in that NSP was Nordling's only client. Nevertheless, Nordling's duties with NSP were legal in nature and Nordling's role as an attorney, subject to ethical rules of his profession, was pervasive. The relationship was one of confidence, requiring an atmosphere of continued mutual trust. When a breakdown of that trust occurred, it was NSP's right, as Nordling's client, to discharge him without liability for breach of contract. We therefore hold that the district court did not err in ruling as a matter of law that Nordling's status as in-house counsel precluded a breach of contract action against NSP.[1]

## II.

Nordling pled two tortious interference with contract claims. The first, against Nordling's now-deceased supervisor, David McGannon, alleges that McGannon's act of discharging Nordling constituted tortious interference with contract. The second, against Nordling's co-employee, Jack F. Sjoholm, alleges that Sjoholm committed tortious interference with contract by relating to McGannon Nordling's alleged remark that McGannon could not be trusted. Both claims must fail.

■ The Minnesota Supreme Court has held, as a matter of law, that a party cannot interfere with its own contract. *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 901 (Minn.1982); *Wild v. Rarig*, 302 Minn. 419, 442 n. 16, 234 N.W.2d 775, 790 n. 16 (1975). The "interferor" must be a third party; no liability for this tort exists against a party to the contract. *Houser v. City of Redmond*, 91 Wash.2d 36, 39, 586 P.2d 482, 484 (1978). The acts of a corporate officer within the scope of his or her duties constitute the acts of the

---

**1.** We find the general rule allowing a client an unfettered right to discharge its attorney applicable to preclude Nordling's retaliatory discharge claim as well. We therefore do not reach the question of whether Nordling produced sufficient evidence to support a cause of action under Minn.Stat. § 181.932.

corporation, and the officer is thus shielded from personal liability for tortious interference with contract. *See Bouton,* 321 N.W.2d at 900–01; *Furlev Sales and Assoc. v. North Am. Automotive Warehouse,* 325 N.W.2d 20, 26 (Minn.1982).

 McGannon had no personal capacity to discharge Nordling. In terminating Nordling's employment, McGannon acted within the scope of his duties as NSP's Vice President of Law. We therefore hold that the district court did not err in dismissing the tortious interference with contract claim against McGannon.

 As to Nordling's claim against Sjoholm, Minnesota courts have never recognized a cause of action against a co-employee for tortious interference with an employment contract. We decline, on the facts of this case, to take the unprecedented step of recognizing such a cause of action.

Respondent raises the issues of whether NSP's Employment Handbook and "Positive Discipline" policies constitute a contract offer and whether Minnesota recognizes an independent cause of action for breach of an implied-in-fact covenant of good faith and fair dealing. We do not address these issues. They are not properly before this court, as respondent failed to file a notice of review.

## DECISION

The district court did not err in granting summary judgment in NSP's favor on Nordling's wrongful discharge claims.

The district court properly granted summary judgment in favor of McGannon and Sjoholm on Nordling's tortious interference with contract claims.

Affirmed.

KALITOWSKI, Judge (concurring in part, dissenting in part).

I agree with the trial court's dismissal of appellant's claims involving tortious interference with contract. However, I do not believe that appellant's claim of wrongful discharge should have been dismissed as a matter of law. The general rule allowing a client to discharge its attorney without liability for breach of contract developed in the context of lawsuits between attorneys in private practice and their clients. *See, e.g., Martin v. Camp,* 219 N.Y. 170, 114 N.E. 46 (1916); *Lawler v. Dunn,* 145 Minn. 281, 176 N.W. 989 (1920); *Meagher v. Kavli,* 251 Minn. 477, 492–93, 88 N.W.2d 871, 882 (1958). I question applicability of the general rule to in-house counsel, especially on the present facts.

First, the situation of in-house counsel is simply not analogous to that of a private attorney. A private attorney works much like an independent contractor, generally having a diverse client base. A private attorney controls the hours he or she works, and the compensation and benefits he or she receives. Most importantly, a private attorney controls the focus and nature of his or her practice, and may decline to represent certain clients or to take particular types of cases. In-house counsel, on the other hand, is subject to control by his or her only "client," the corporation. The corporation controls the hours in-house counsel works, the salary and benefits he or she receives and the focus and nature of in-house counsel's practice. Further, in-house counsel may be subject to the corporation's own disciplinary measures in addition to those of the Lawyers Professional Responsibility Board. Unlike a private attorney, in-house counsel, if discharged by the corporation, may be unable readily to secure new clients. The focus of in-house counsel's work is much narrower than that of a private attorney. In-house counsel thus changes his or her marketability in reliance on continued employment with the corporation. The relationship of in-house counsel and corporation is dual in nature: the relationship is one of attorney-client as well as of employer-employee. Unlike the *Herbster* court, *see Herbster v. North Am. Co. for Life & Health Ins.,* 150 Ill.App.3d 21, 103 Ill.Dec. 322, 501 N.E.2d 343 (1986), *cert. denied,* 114 Ill.2d 545, 108 Ill.Dec. 417, 508 N.E.2d 728; *cert. denied,* 484 U.S. 850, 108 S.Ct. 150, 98 L.Ed.2d 105 (1987), I do not believe the attorney-client relationship negates the enforceability of an employment contract.

Second, I do not believe, as the *Herbster* court did, that the confidential nature of the relationship between in-house counsel and its client-employer would necessarily be jeopardized by limitations on the corporation's right to discharge in-house counsel. *See Herbster*, 150 Ill.App.3d at 27, 103 Ill. Dec. at 325–26, 501 N.E.2d at 346–47. In the present case, a personal dispute between Nordling and his supervisor in the Law Department, rather than matters involving Nordling's legal representation of NSP, appears to have led to his discharge. I question whether evidence produced at a trial in this action would be any more damaging to NSP than highly sensitive nonprivileged information introduced in a wrongful discharge suit by a high-level employee who is not an attorney.

I believe Nordling has produced sufficient evidence that he was not an at-will employee to preclude summary judgment. *See Pine River State Bank v. Mettille*, 333 N.W.2d 622, 627 (Minn.1983) (employee handbook or disciplinary procedures may cause contractual modification of at-will employment). Therefore, I would reverse and remand this issue for trial.