Victor John **MICHAELSON**, Jr., Appellant,

v.

**MINNESOTA MINING & MANUFACTURING COMPANY, Respondent,**

Allen F. Jacobson, et al., Defendants.

No. C6–91–113.

Court of Appeals of Minnesota.

July 30, 1991.

Review Granted Sept. 25, 1991.

Robert J. Brenner, Christopher R. Walsh, Robert Brenner & Associates, Minneapolis, for appellant.

Eric J. Magnuson, William T. Egan, Jeffrey D. Carpenter, Rider, Bennett, Egan & Arundel, Minneapolis, for respondent.

Considered and decided by PARKER, P.J., PETERSON and SCHULTZ,* JJ.

## OPINION

HAROLD W. SCHULTZ, Judge.

Appellant challenges summary judgment for respondent and alleges that the trial court erred when it found no genuine issues of material fact in any of appellant's common law claims arising out of their employment relationship. We affirm.

## FACTS

In 1974, respondent Minnesota Mining and Manufacturing Company hired appellant Victor Michaelson, an attorney specializing in labor issues, to work in their office of general counsel. Appellant alleges respondent made assurances to him that if he did good work he could work until retirement. In addition, appellant points to three documents which respondent distrib-

---

* Retired judge of the district court acting as judge of the Court of Appeals by appointment pursuant to Minn.Const. art. VI, § 2.

uted to its employees as making promises which created a unilateral employment contract. Those documents were the 3M *Guide to Conduct*, the *3M Office Operating Manual* and the *Corrective Action* guide.

In his early years with respondent, appellant experienced serious financial problems, a fact which is uncontested here. Respondent helped appellant solve those problems. In addition, the Minnesota Lawyers Professional Responsibility Board twice limited appellant's license to practice due to disciplinary problems. As a result, respondent's practice is limited to his representation of respondent. Although respondent had supported appellant through these difficult times, it began to feel that appellant's problems "reflected adversely" on respondent.

Appellant worked primarily with the respondent's Human Resources department as an employment lawyer dealing with equal employment opportunity (EEO) issues. On several occasions, respondent sought appellant's evaluation and advice on employment problems and situations. Appellant counseled respondent on the law and gave his opinion as to the appropriate measures that respondent should have taken. On several of those occasions, respondent chose not to follow appellant's advice.

Annual performance reviews show that respondent found appellant's work to be consistently above average. These favorable reviews continued until September 1987 when an interim performance review reported a decline due to appellant's lack of proper time management, attention to cases and special projects, and a lack of communication with management. Respondent reviewed appellant early in order to give him the opportunity to correct the situation before the next formal performance review came due. That report, followed by a meeting between appellant and his supervisors, modified appellant's job responsibilities.

Respondent reassigned appellant to develop an educational and training program for the Human Resources department on issues regarding EEO and employment law. This reassignment of duties did not change appellant's status as respondent's legal advisor on EEO and employment law matters, but rather transferred the burden of litigation from appellant to another attorney in the department. Appellant maintained the same status, title, salary and benefits as he had before the reassignment. Respondent never terminated the employment relationship; it merely reassigned appellant's duties.

Appellant sent respondent a letter on October 19, 1987 which announced that appellant found the transition into his new assignment to be difficult and met with resistance from respondent. Appellant took a two-week vacation after which he never returned to work. Currently, appellant remains on long-term disability leave and receives disability compensation from respondent.

Appellant brought this action in Ramsey County District Court, charging respondent with breach of contract, breach of an implied covenant of good faith and fair dealing, retaliation in violation of public policy, defamation, tortious interference with contract and prospective relations, and intentional infliction of emotional distress. The trial court granted respondent summary judgment on all claims and awarded respondent costs and disbursements.

Appellant alleges the trial court erred in its grant of summary judgment. Respondent filed a notice of review on the issue of the rights and status of in-house counsel in an employment dispute, an issue presented below, but which the trial court did not address.

## ISSUES

1. Does appellant's employment as in-house counsel for respondent bar all of his claims summarily?

2. Do genuine issues of fact exist regarding the nature of employment contract between appellant and respondent?

3. Did the trial court err as a matter of law in concluding that appellant failed to state a claim under Minn.Stat. § 181.932?

4. Did the trial court err as a matter of law in concluding that appellant's "at-will" employment was not subject to an implied covenant of good faith and fair dealing or tortious interference?

5. Did the trial court err as a matter of law in concluding that appellant's claims failed to support a cause of action for defamation?

## ANALYSIS

1. A well-settled principle of Minnesota law establishes that a client may discharge an attorney at any time, with or without cause. *Lawler v. Dunn*, 145 Minn. 281, 284, 176 N.W. 989, 990 (1920). Based on this principle, the discharge of an attorney does not constitute a breach of contract. *Id.* Further, the attorney cannot hold the client liable for damages due to the breach but rather is entitled only to the reasonable value of services rendered (quantum meruit). *Id.*

The Minnesota Rules of Professional Conduct, which incorporate the rule allowing a client to discharge an attorney, provide in part:

> [A] lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if * * * the lawyer is discharged.

Minn.R.Prof.Conduct 1.16(a)(3).

This court has recently discussed this issue in the context of in-house counsel in *Nordling v. Northern States Power*, 465 N.W.2d 81 (Minn.App.1991), *pet. for rev. granted* (Minn. Mar. 18, 1991). In *Nordling*, a breakdown of mutual trust between NSP and in-house counsel caused NSP to terminate the employment relationship. *Id.* at 86. Relying on *Herbster v. North American Co. for Life & Health Ins.*, 150 Ill.App.3d 21, 103 Ill.Dec. 322, 501 N.E.2d 343 (1986), *appeal denied* 114 Ill.2d 545, 108 Ill.Dec. 417, 508 N.E.2d 728, *cert. denied* 484 U.S. 850, 108 S.Ct. 150, 98 L.Ed.2d 105 (1987), the *Nordling* court stated, "the client must have absolute authority to fire the attorney, especially when a breakdown of trust occurs." *Nordling*, 465 N.W.2d at 86.

Respondent here argues that appellant was respondent's attorney and as such may not raise claims against respondent for events which arose during their attorney-client relationship. We agree. An attorney cannot properly bring a lawsuit against his client and transform confidential data generated in the course of representation into evidence against his client. Such conduct subverts the attorney-client privilege as well as the well-established principle that, as between an attorney and client, the power to terminate or modify the relationship must remain with the client.

We note that even as we review this file, respondent has not yet terminated appellant but still maintains him on the payroll. Respondent hired appellant as legal counsel in 1974. The record shows that appellant has served respondent quite well, and that respondent, in turn, has been faithful and patient with appellant, and has assisted him financially and professionally through his various crises over the years. When appellant's job performance began declining, respondent reassigned appellant away from litigation and into administration in an attempt to alleviate his problems with time management and case management. Respondent met with appellant to discuss his performance and these new assignments.

Considering that respondent could have terminated appellant lawfully, we find respondent's conduct well within the client's scope of authority. However, because of the trial court's ruling, we move on to consider appellant's contention that the trial court abused its discretion when it granted summary judgment for respondent.

2. A trial court may grant summary judgment if the pleadings and documents submitted to the court "show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R.Civ.P. 56.03. Summary judgment is proper when the nonmoving party fails to oppose the motion by presenting specific facts which create a genuine issue of fact. *Hunt v. IBM Mid America Employees Federal Credit Union*, 384 N.W.2d 853,

855 (Minn.1986). "A material fact is one of such a nature as will affect the result or outcome of the case depending on its resolution." *Zappa v. Fahey,* 310 Minn. 555, 556, 245 N.W.2d 258, 259–60 (1976).

On review of a grant of summary judgment, this court must determine whether genuine issues of material fact exist and whether the trial court erred in its application of the law. *Hunt,* 384 N.W.2d at 855.

Appellant argues that respondent's statements and publications changed the nature of appellant's employment from an at-will employee to a party to a unilateral contract. We disagree. The parties here set no term of employment for appellant. When an employee is hired for an indefinite amount of time, employment is considered "at-will." *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn.1983). "Permanent" employment means that "the term being indefinite, the hiring is merely at will." *Skagerberg v. Blandin Paper Co.,* 197 Minn. 291, 294, 266 N.W. 872, 874 (1936) (citation omitted). "At will" means "the employer can summarily dismiss the employee for any reason or no reason, and that the employee, on the other hand, is under no obligation to remain on the job." *Pine River,* 333 N.W.2d at 627.

Interpretation of a contract is a legal determination which rests with the court. *Rooney v. Dayton–Hudson Corp.,* 310 Minn. 256, 262, 246 N.W.2d 170, 173 n. 2 (1976). As evidence of a unilateral contract, appellant first cites respondent's statement that so long as appellant performed his job well, he would remain employed until retirement. Such a promise of employment for an unspecified duration may create a binding unilateral contract so long as the offer is definite, the employer communicates the offer to the employee/offeree and the employee accepts it and furnishes consideration. *Pine River,* 333 N.W.2d at 626–27. Outward manifestations of the parties determine whether or not a proposal is an offer for a unilateral contract. *Id.* at 626. However, an assurance of a " 'career position' * * * falls far short of establishing a lifetime contract." *Degen v. Investors Diversified Servs.,* 260 Minn. 424, 428, 110 N.W.2d 863, 866 (1961). Respondent's statement to appellant does not constitute a definite offer or manifest an intent to contract. Rather, the statement falls well within the purview of *Pine River* and *Degen* and does not create a unilateral contract.

Appellant next argues that the employee handbooks and managerial guides which respondent distributed to staff created a unilateral contract which required good cause for discharge. In *Pine River,* 333 N.W.2d at 627, the Minnesota Supreme Court first recognized that statements regarding job security in an employee handbook may alter an at-will employment relationship and become part of the original employment contract so long as the handbook provision meets the requirements for a unilateral contract: definite offer, communication to the offeree, and the employee's acceptance.[1] In such a case, the at-will employee "accepts" the offer by remaining on the job with full knowledge of the new provisions in the handbook. *Pine River,* 333 N.W.2d at 627.

The Minnesota Supreme Court has addressed this issue in other cases since *Pine River,* each requiring a high level of specificity in order to alter an employment contract. *See Lewis v. Equitable Life Assurance Soc'y,* 389 N.W.2d 876, 883 (Minn. 1986) (handbook provision on dismissal was "definite enough to permit a jury to conclude that plaintiffs received certain con-

---

1. In addition, Minnesota courts have created three other exceptions to the "at-will" doctrine: an at-will employee has cause of action for wrongful discharge when terminated for refusal to violate a law, *Phipps v. Clark Oil & Ref. Corp.,* 408 N.W.2d 569, 571 (Minn.1987); under promissory estoppel theory, employee may recover damage when she leaves one job in reliance upon employment offer with another employer who revoked the offer before she could begin work, *Grouse v. Group Health Plan, Inc.,* 306 N.W.2d 114, 116 (Minn.1981); if an employee gives independent consideration beyond his personal employment services, that can create a contract which requires good cause for discharge, *Bussard v. College of St. Thomas,* 294 Minn. 215, 223, 200 N.W.2d 155, 161 (1972).

tractual rights"); *Hunt,* 384 N.W.2d at 855, 857 (vague language regarding discipline and discharge procedures did not create an offer of a unilateral contract).

The 3M "Guide to Conduct" which respondent distributed to its employees states as a general point of introduction:

When an employee's conduct is not in accord with this GUIDE, corrective and/or disciplinary action may be required. It is the policy of [respondent] before taking action to examine each case individually, considering the nature of the violation, the past record and the service of the employee involved.

The guide then goes on to list examples of "misconduct" and states, "Violations of this type can result in corrective and/or disciplinary action up to and including discharge." These provisions do not establish a specific disciplinary procedure, nor do they grant employees certain rights to process before discharge may occur. As such, these provisions do not meet the required level of specificity set out in *Pine River.*

■ Respondent also distributed a guide titled *Corrective Action* and the *3M Office Operating Manual* which appellant cites for similar contractual purposes. The corrective action guide instructs managers on dealing with personnel. We note that appellant was not in a managerial position and thus not the target of this publication. The operating manual, in contrast, does have a specific section addressed to salaried personnel. This manual states on its introductory page, however, "The contents contained herein shall not, under any circumstances, be considered a part of any employment agreement, with any employee." An employer may include such a contract disclaimer as a valid expression of its intentions. *Audette v. Northeast State Bank,* 436 N.W.2d 125, 127 (Minn.App. 1989); *Kulkay v. Allied Central Stores,* 398 N.W.2d 573, 578 (Minn.App.1987), *pet. for rev. denied* (Minn. Feb. 13, 1987).

■ We do not read these policy guides to modify appellant's at-will employment contract with respondent. The trial court properly determined that these guides had no legal effect upon appellant's employment status.

■ 3. Appellant's claim of retaliatory discharge arises out of several instances in which appellant investigated problems which arose from respondent's employment practices. Although appellant advised respondent on the proper steps to resolve the problems, respondent often did not follow appellant's advice. Appellant alleges that the trial court erred as a matter of law when it concluded that appellant failed to state a proper claim. We cannot agree.

Minn.Stat. § 181.932, subd. 1(a) (Supp. 1987) provides:

An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because * * * the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official.

Appellant was unable to maintain a successful action for several reasons. First, except for appellant's opinion that respondent's plans may have violated Title VII and EEO laws, he offered no proof of such violations. Second, he did not "report" conduct, but rather gave his supervisor feedback, based upon his legal analysis, regarding proposed business decisions. Third, he did not report the alleged violations to any other outside authority. Fourth, appellant produced no evidence of the causal connection between his feedback on respondent's proposed actions and the alleged retaliation. Fifth, respondent did not discharge appellant, but rather redefined his employment responsibilities in light of his recent inability to handle all matters efficiently. Based on this record, we believe the trial court properly concluded:

As a member of [respondent's] Office of General Counsel, [appellant] was expected to render his legal opinion on employment matters. Furthermore, there

is no evidence of any causal connection between [appellant's] rendering opinions and his subsequent job reassignment. [Appellant] has not submitted sufficient evidence to support a retaliation claim under Minnesota Statute § 181.932.

4. Next, appellant charges that the trial court erred as a matter of law when it concluded that appellant's at-will employment was not subject to an implied covenant of good faith and fair dealing or to tortious interference. Again, we disagree.

As a rule, Minnesota courts have not read an implied covenant of good faith and fair dealing into employment contracts. *Hunt*, 384 N.W.2d at 858; *Wild v. Rarig*, 302 Minn. 419, 441, 234 N.W.2d 775, 790 (1975), *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). Further, where evidence is insufficient to demonstrate the existence of a unilateral employment contract, policy statements are also insufficient to create a covenant of good faith and fair dealing. *Lee v. Metropolitan Airport Comm'n*, 428 N.W.2d 815, 822 (Minn.App.1988).

Here, the trial court properly concluded that appellant's claims must fail because the underlying unilateral employment contract does not exist; appellant is an at-will employee.

A person may be held liable for interference with a contract, however, even if the contract is terminable at will. *American Sur. Co. v. Schottenbauer*, 257 F.2d 6, 10 (8th Cir.1958). Appellant accuses his coworkers of interfering with his employment contract with respondent. These coworkers acted within their capacity as employees of respondent when they evaluated appellant's job performance and reassigned him to new duties which they believed would better serve all parties involved. We do not view such conduct as interference with appellant's employment contract. Further, even if we agreed that these workers had interfered, as agents of respondent they are protected from liability because they were acting on behalf of one party to the contract. A party cannot interfere with its own contract. *Bouten v.*

*Richard Miller Homes, Inc.*, 321 N.W.2d 895, 901 (Minn.1982). Rather, the "interferor" must be a third party. *Nordling*, 465 N.W.2d at 86. The trial court properly granted summary judgment on this issue.

5. Finally, appellant argues the trial court erred as a matter of law when it concluded that appellant's claims failed to create a cause of action for defamation. Common law defamation consists of a false statement about the plaintiff which is communicated ("published") to a third party and which tends to harm the plaintiff's reputation or standing in the community. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980). Truth is a complete defense to a claim of defamation. *Id.*

As basis for this claim, appellant cites the letter of September 10, 1987, in which respondent enumerated deficiencies in appellant's job performance and the company's decision to reassign him to new duties. We cannot agree with appellant that respondent defamed him when it sent a copy of the letter to two of appellant's supervisors and discussed his performance in the presence of these two men. Preparation of and distribution of a letter to a personnel file and to other officers may constitute publication sufficient to support a cause of action. *Frankson v. Design Space Int'l*, 394 N.W.2d 140, 144 (Minn. 1986). Such a cause of action may be defeated, however, by a showing that the publication is protected by a qualified privilege. *Lewis*, 389 N.W.2d at 889–90.

[A] communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel. Actual malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover.

*Stuempges*, 297 N.W.2d at 256–57 (quoting *Hebner v. Great N. Ry.*, 78 Minn. 289, 292, 80 N.W. 1128, 1129 (1899)). In order to prove actual malice, appellant must show

"actual ill will, or a design causelessly and wantonly to injure" appellant. *Frankson,* 394 N.W.2d at 144 (quoting *McBride v. Sears, Roebuck & Co.,* 306 Minn. 93, 98, 235 N.W.2d 371, 375 (1975)).

The letter from respondent candidly addresses its concerns with appellant's job performance and its reasons for reassigning his duties. Although publication did occur through distribution of the letter to third parties, the record does not establish that respondent made false statements nor that it made those statements with the requisite actual malice to create a cause of action. The trial court properly concluded that these statements did not constitute defamation and, if they had, that they were privileged under *Lewis,* 389 N.W.2d at 889–90.

## DECISION

The trial court properly granted summary judgment in favor of respondent on all common law claims.

Affirmed.