Donald J. WILLY, Appellant,

v.

## COASTAL STATES MANAGEMENT COMPANY, Appellee.

No. 01–94–01261–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 24, 1996.

Rehearing Overruled Feb. 13, 1997.

---

**194**

Michael Maness, Houston, for Appellant.

John P. Campbell, Houston, for Appellee.

Before ANDELL, HUTSON–DUNN and O'CONNOR, JJ.

## OPINION

ANDELL, Justice.

The issue in this case is whether in-house counsel should be allowed to maintain a cause of action for retaliatory discharge under the *Sabine Pilot*[1] exception to the employment-at-will doctrine. Plaintiff, Donald Willy, sued the defendant, Coastal States Management Company (Coastal),[2] for wrongful termination. Willy alleged that he was fired from his position as an environmental attorney solely because he refused to falsify environmental reports and to participate in the criminal concealment of violations of state and federal environmental laws.

A jury found that Coastal wrongfully terminated Willy, and awarded him $267,283 in actual damages and $232,717 in punitive damages. In its final judgment, the trial court awarded prejudgment interest on the actual damages in the amount of $412,757.99. However, in response to Coastal's motion to reform the judgment, the trial court signed a final amended judgment that awarded no prejudgment interest.

Both Willy and Coastal perfected appeals. Coastal appeals the judgment ·in favor of Willy. Willy appeals the trial court's denial of prejudgment interest.

### Background

Coastal hired Willy as an in-house environmental attorney in early 1981. He was fired on October 1, 1984. His supervisor at that

---

1. *See Sabine Pilot Serv., Inc. v. Hauck,* 687 S.W.2d 733, 735 (Tex.1985) (an employee may not be fired for the sole reason that he or she refused to perform an illegal act).

2. Willy sued both Coastal Corporation and Coastal States Management Co., a subsidiary of Coastal Corporation that employs a corporate staff that provides services for Coastal Corporation. After trial, the trial court granted the defendants' motion for j.n.o.v. as to Coastal Corporation only.

time, William Dunker, documented the reason for Willy's termination as follows:

> The primary reason for this termination is the fact that you failed to report certain actions taken by you with respect to the Corpus Christi Refinery environmental matters. · When asked if you had taken such action, you unequivocally denied such action.

Before he was fired, Willy had never received a reprimand, had never been subject to disciplinary action, had received merit raises, and was considered by his peers and superiors to be a well-qualified environmental attorney.

When Willy was hired, Coastal employed two other environmental attorneys in its legal department, Troy Webb and William Dunker. Clinton Fawcett supervised the three environmental attorneys. Each of the attorneys was responsible for providing legal advice to Coastal Corporation subsidiaries, three of which are relevant to this appeal: Derby Refining in Wichita, Kansas; the Belcher Oil Company; and the Coastal refinery in Corpus Christi. Derby and Belcher were considered to be Willy's clients. Troy Webb was the attorney assigned to the Corpus Christi refinery. The following facts and circumstances relating to these three facilities are at the heart of Willy's allegation of wrongful termination.

## I. Derby Refining

According to Willy's testimony, in August 1981, Troy Webb approached him regarding a letter Webb had written to the Environmental Protection Agency (EPA). Webb asked Willy to speak to the EPA regional director, a personal friend of Willy, in support of the letter. Willy refused to do so because in the letter, Webb "lied to the EPA about the use of processed gas in the [Derby] refinery." Willy testified that it took him two years to rectify the harm caused by Webb's misrepresentations, but that at his insistence, Derby purchased—at great expense—a sulphur recovery plant that alleviated the processed-gas problem.

Willy also testified that because of groundwater contamination at the Derby refinery, a trench to intercept organic chemicals had to be built. The company's original plans called for a trench a quarter-mile long, but Willy believed that was not long enough. Although he was asked to tell the Kansas Department of Water Quality that the shorter trench was sufficient, he refused. Willy stated he persuaded the company to build a longer, more expensive trench.

## II. The Belcher Report

In January 1984, the newly-appointed president of Belcher asked for an environmental audit of the Belcher facilities. Willy, Webb, and Keith Pardue, an environmental engineer, conducted the audit. Webb and Pardue visited the facilities; Willy reviewed paperwork at Belcher headquarters. Based on the information gathered in the audit, Willy drafted a 22–page memorandum (the Belcher Report) that he described as "an analysis of the legal and technical compliance situation at Belcher." Attachments to the Belcher Report included a memorandum from Keith Pardue that described the method used for the on-site inspections, and copies of Pardue's notes from his visits to the various facilities. The report also incorporated a memo written by Troy Webb concerning the "legal implications of environmental regulations as they apply to the Belcher facilities."

Sometime in May 1984, before the Belcher Report was finalized, Clinton Fawcett, Willy's supervisor, returned the draft of the Belcher report to Willy with a number of proposed editorial revisions that included the deletion of several paragraphs and the rewording of certain text; Fawcett had also put question marks by several passages. Fawcett asked Willy to make the changes he had recommended, but Willy refused. It is unclear whether a revised version of the report was ever provided to Belcher's president, but it is uncontroverted that Willy did not make the changes requested by Fawcett. Willy asserts that by making those changes, he would have been "knowingly falsifying, or knowingly failing to disclose, material facts that would have to be used by the clients [Belcher and its president] in their efforts to comply with the law."

## III. The Corpus Christi Refinery

In 1984, the Corpus Christi refinery had a landfill adjacent to the plant into which it had been depositing various waste products. Coastal had been dumping waste into this area since the 1970s. Coastal had applied for a permit to store hazardous waste at that location, but did not have a permit.

In January 1984, as a result of violations of various environmental laws, Coastal entered into a compliance agreement with the Texas Department of Water Resources (TDWR).[3] The agreement specified certain actions that Coastal was required to take. Coastal had, however, submitted a delisting petition to the EPA. By submitting a delisting petition, Coastal formally asked the EPA to determine that the specific waste at the Corpus Christi facility was not hazardous. Coastal did not meet certain deadlines mandated by the compliance agreement. Troy Webb told Russell Lewis, an inspector with TDWR, that Coastal was not meeting its deadlines because it had sought delisting, and that if the EPA granted the delisting petition, there would be no violation of environmental laws. The EPA did not, however, grant the delisting petition. Willy testified that "[e]veryone knew that the delisting petition would [not] be granted by the EPA," and that the delisting petition was a method by which Coastal could delay correcting the various environmental law violations.

The Corpus Christi facility was considered to be Webb's client. In June of 1984, however, Willy had a telephone conversation with TDWR inspector Lewis concerning financial assurance documents Coastal was required to file. This phone call was the action "taken by you with respect to the Corpus Christi Refinery environmental matters" that Dunker referred to in his letter of termination.

In August 1984, the manager of the Corpus Christi refinery, Bob Johnston, wrote a memo to his superior about Troy Webb. Johnston stated that he was dissatisfied with Webb because Webb did not "treat the refinery as a client" and because Webb did not have a good relationship with TDWR personnel. Johnston asked that Willy be assigned to replace Webb as the Coastal attorney responsible for the Corpus Christi refinery.

## IV. Willy's termination

In late spring of 1984, Dunker replaced Fawcett as Willy and Webb's supervisor. On September 25, 1984, Dunker held a meeting with Willy. Before the meeting, Dunker prepared two documents. One was a memo assigning Willy to the Corpus Christi refinery. The second document was titled "Letter of Warning." In this letter, Dunker stated in part:

> [C]ertain of your activities have resulted in severe disruptions in Department personnel relations and have hindered the effective and efficient functioning of the Department. These and other activities on your part have, in my opinion, demonstrated very poor judgment, but even more importantly, they have degraded our ability to provide the highest possible level of legal support to meet the needs of our clients. This situation cannot continue; therefore, consider this a formal warning that if these disruptive activities continue I will be forced to terminate your employment with this company. Additionally, since I believe your course of behavior has detracted from the overall functioning of this Group, I cannot approve a merit pay increase for 1984.

Without Willy's knowledge, Dunker tape-recorded the meeting. He began the meeting by discussing Willy's reassignment to Corpus Christi. Dunker then brought up a perceived personality conflict between Willy and Webb. He invited Webb and Pardue to join the meeting. Dunker asked Willy if he had ever called the TDWR in Corpus Christi. Willy denied making such a call. Dunker told Willy that another Coastal employee, Martin Hall, had told Webb and Pardue that Willy had called Russell Lewis at the TDWR and that Lewis told Willy that the agency was planning to sue Coastal. Dunker called Hall on his speakerphone and asked him if, to his knowledge, Willy had called the TDWR. Hall denied knowing anything about the call. After the call to Hall, Willy

---

3. The TDWR is now known as the Texas Natural Resource Conservation Commission.

and Webb argued, accusing each other of "backstabbing." Dunker told the men:

> In my seven years here at Coastal I've never had this type of problem and ... Don, I'll be frank, this problem has been generating since you've been here and its down to a believability contest, and frankly, I think that Troy may have made a couple of statements that I think are more right, but I think, from what I hear that you've made the statements [sic] and I get this feeling, and I can't substantiate it right now, that you've caused a lot of goddamn problems and I want it to stop. I don't want any more backstabbing out of anybody, and if I hear about any of it, any of it, I'm going to clean house and I'll clean house immediately. Is that understood? Troy? .... Keith? .... Don, do you understand that?

Dunker never gave the letter of warning to Willy. He wrote across the bottom of the letter, "9/25–Action withheld. Written warning not delivered."

The next day, Dunker called Russell Lewis at the TDWR; Lewis confirmed that he had spoken to Willy in June. On October 1, Dunker and Willy met again. Dunker tape-recorded the conversation. In Willy's presence, Dunker again called Lewis, and asked him if he had spoken to Willy about the financial assurance issue in June. Lewis confirmed the conversation. Willy said he did not remember speaking to Lewis, but Lewis reiterated that they had spoken. After Lewis hung up, Willy and Dunker argued about whether the call took place. Dunker told Willy:

> I will tell you what the relevance is, Don. I asked you very specifically three or four times whether or not you had talked to him. You said, no, unequivocally no. No, you have never talked to anyone down there. You have never talked to him. I can't trust you.

Dunker then asked for Willy's resignation. When Willy refused to resign, Dunker fired him.

Willy asserts that the reasons given for his termination—his inability to get along with others and the "lie" he told Dunker regarding the phone call to Lewis—were pretextual.

He stated at trial that he was fired because "they didn't like what I said in the Belcher Report and wanted to try to bury it so they wouldn't have to spend the money at Belcher and the fact that I spent three and a half million dollars at Derby to comply with the environmental laws." Coastal, he asserted, did not want him to assume responsibility for the Corpus Christi refinery because he would insist on expensive remedial measures for the environmental problems at that facility, just as he had done with Derby.

Coastal asserts that although Willy was a capable environmental attorney, his inability to get along with others, coupled with Dunker's belief that Willy had lied about his communications with the TDWR, led to his termination.

### Coastal's points of error

In three points of error, Coastal asserts that (1) Willy's claims are barred as a matter of law because of the nature of the attorney-client relationship, (2) Willy's refusal to revise the Belcher report could not have subjected him to criminal liability, and (3) the evidence was insufficient to support the jury's verdict.

### I.  Employment at will

■ The long-standing rule in Texas is that employment for an indefinite term may be terminated at will and without definite cause. *Sabine Pilot*, 687 S.W.2d at 734. However, the supreme court has held that public policy requires a very a narrow exception to the employment-at-will doctrine. "That narrow exception covers only the discharge of an employee for the sole reason that the employee refused to perform an illegal act." *Sabine Pilot*, 687 S.W.2d at 735. The *Sabine Pilot* exception to the at-will doctrine only applies if the plaintiff was "unacceptably forced to choose between risking criminal liability or being discharged." *Winters v. Houston Chronicle Publishing Co.*, 795 S.W.2d 723, 724 (Tex.1990).

### II.  Attorney-client relationship

■ In point of error one, Coastal asserts that Willy's claim is barred as a matter of

law by the very nature of the attorney-client relationship. Coastal characterizes Willy's claim that he was discharged for refusing to change the Belcher report as a claim that his client—Coastal—terminated his services as an attorney because the client did not like his legal advice, and that his claim is barred by the law governing the attorney-client relationship. Coastal argues that a client may terminate the attorney-client relationship for any reason and that this right to discharge an attorney applies to in-house counsel. Coastal also asserts that even if Willy could maintain a suit for wrongful discharge, his claim must fail as a matter of law because he cannot prove his claim without breaching his ethical obligations to Coastal.

### A. Does the nature of the attorney-client relationship preclude a wrongful discharge claim by in-house counsel against his former employer/client?

Coastal asserts that a client's right to discharge an attorney is absolute, and that if an attorney disagrees with the client's judgment about a matter, the attorney's only alternative is to resign. Coastal further argues that these rules apply to in-house as well as outside counsel. There are no Texas cases addressing the issue of whether an in-house attorney can maintain a cause of action for wrongful termination, and only a handful of cases from other jurisdictions. There seem to be three approaches to such resolving this issue: (1) not allowing the cause of action under any circumstances; (2) allowing the cause of action if client confidentiality can be maintained; and (3) allowing the cause of action under an implied contract theory or a statutory cause of action. We will examine the reasoning of each approach.

### 1. Cases holding no cause of action available

The Illinois Supreme Court has held that in-house counsel cannot bring a claim for retaliatory discharge. *Balla v. Gambro,* 145 Ill.2d 492, 164 Ill.Dec. 892, 896, 584 N.E.2d

104, 108 (1991). In *Gambro,* the defendant fired the plaintiff after he told the defendant he would do whatever was necessary to stop the defendant's sale of defective dialyzers. *Id.* at 895, 584 N.E.2d at 107. The court found that while the plaintiff's discharge was indeed in contravention of public policy, the public policy at issue—protecting the lives of citizens—was adequately protected by the state's rules of professional conduct, which required the plaintiff to report his employer's intention to sell the defective equipment. *Id.* at 896–97, 584 N.E.2d at 108–09. The court further noted that extending the tort of retaliatory discharge to in-house counsel would have an undesirable effect on the relationship between employers and their in-house counsel. *Id.* at 897, 584 N.E.2d at 109. "[T]he danger exists that if in-house counsel are granted a right to sue their employers in tort for retaliatory discharge, employers might further limit their communication with their in-house counsel." *Id.*

In *Herbster v. North Am. Co.,* 150 Ill. App.3d 21, 103 Ill.Dec. 322, 323, 501 N.E.2d 343, 344 (1986), the plaintiff claimed he was fired as in-house counsel after he refused to destroy discoverable information. *Id.* The court of appeals refused to recognize a cause of action for retaliatory discharge because of the confidential and fiduciary nature of the attorney-client relationship. *Id.* at 326–27, 501 N.E.2d at 347–48. The court recognized that the plaintiff was an employee of the defendant corporation, but could not "separate [his] role as employee from his profession." *Id.* at 325, 501 N.E.2d at 346. The court also noted that the client has the unfettered right to terminate the attorney-client relationship and to substitute other counsel. *Id.* at 326, 501 N.E.2d at 347.

In *Willy v. Coastal Corp.,* 647 F.Supp. 116, 118–19 (S.D.Tex.1986), *rev'd on other grounds,* 855 F.2d 1160 (5th Cir.1988)[4], a federal district court in Texas refused to extend the *Sabine Pilot* exception to the employment-at-will doctrine to apply to wrongful termination claims by in-house counsel. *Id.* at 118. The court noted that if

---

**4.** This case involved the same parties and dispute that are before us in the case at bar. The federal court held appellant had no cause of action under Texas law and dismissed the case. That

judgment was reversed for want of federal question jurisdiction. The case was then tried in state court and the present appeal followed.

an attorney believed his client was intent upon pursuing an illegal act, the attorney's remedy was to voluntarily withdraw from employment. *Id.* When an attorney chose not to do so, the client could terminate the attorney, who would then be manditorily required to withdraw from representation. *Id.* The court noted that the disciplinary rules did not distinguish between retained counsel or in-house counsel. *Id.*

### 2. Cases permitting cause of action if confidentiality preserved

The supreme courts of both Massachusetts and California have held, however, that under certain circumstances, an in-house lawyer may bring a claim for retaliatory discharge against an employer. *See GTE Prod. Corp. v. Stewart,* 421 Mass. 22, 653 N.E.2d 161 (1995); *General Dynamics Corp. v. Superior Court,* 7 Cal.4th 1164, 32 Cal.Rptr.2d 1, 876 P.2d 487 (1994).

In *Stewart,* the plaintiff asserted that he had been wrongfully discharged in retaliation for, among other things, his insistence that GTE comply with federal laws regarding the disposal of hazardous waste. 653 N.E.2d at 163. The court held, first, that the plaintiff's status as in-house counsel for GTE did not preclude him from maintaining his suit. *Id.* at 166. The court went on to hold:

> [A] claim for wrongful discharge brought by in-house counsel will be recognized only in narrow and carefully delineated circumstances. To the extent that in-house counsel's claim depends on an assertion that compliance with the demands of the employer would have required the attorney to violate duties imposed by a statute or the disciplinary rules governing the practice of law in the Commonwealth, that claim will only be recognized if it depends on (1) explicit and unequivocal statutory or ethical norms (2) which embody policies of importance to the public at large in the circumstances of the particular case, and (3) the claim can be proved without any violation of the attorney's obligation to respect client confidences and secrets.

*Id.* at 166–67 (footnotes omitted).

In *General Dynamics,* the court held that there was nothing inherent in the nature of

an attorney's role as in-house counsel that precludes a claim for retaliatory discharge; the court further held, however, that a claim could be maintained only if it could be established without breaching the attorney-client privilege or unduly damaging the values lying at the heart of the professional relationship. 32 Cal.Rptr.2d at 4, 876 P.2d at 490.

### 3. Other cases allowing cause of action

Several other cases have allowed in-house counsel to maintain a cause of action for wrongful discharge. However, we find each of these cases distinguishable.

In *Mourad v. Automobile Club Ins. Ass'n,* 186 Mich.App. 715, 465 N.W.2d 395 (1991), the plaintiff was demoted after he refused to comply with alleged unethical and illegal orders by the corporation. *Id.* The court held that the plaintiff could assert a cause of action for wrongful termination because the corporation's statements of company policy could have given rise to a "just-cause" contract. *Id.* 465 N.W.2d at 399–400. Therefore, the plaintiff in *Mourad* relied on a contractual cause of action rather than a common-law tort action for wrongful discharge. *See also Golightly–Howell v. Oil, Chemical & Atomic Workers Int'l Union,* 806 F.Supp. 921, 924 (D.Colo.1992) (in-house attorney whose employment is subject to "just-cause" contract is not precluded from suing for wrongful termination if attorney-client relationship not implicated).

In *Parker v. M & T Chemicals, Inc.,* 236 N.J.Super. 451, 566 A.2d 215, 217 (App.Div. 1989), the plaintiff alleged that he was constructively discharged from his position as in-house counsel after he questioned the propriety of appropriating a competitor's trade secrets. *Id.* He filed suit pursuant to a state "whistleblower" statute. The corporation contended that the whistleblower statute unconstitutionally impinged on the supreme court's power to regulate the conduct of attorneys. *Id.* 566 A.2d at 219. The court saw no constitutional incompatibility and refused to "read in-house attorneys out of the [statute's] protection." *Id.* at 221. Thus, the *Parker* case relied on the construction of a statute, whereas the present case involves

the availability of an exception to the common law employment-at-will doctrine.

### 4. Conclusion

We find the rationale of the second line of cases discussed above to be the most persuasive. Such an approach attempts to balance the concerns of attorney-client confidentiality with in-house counsel's right to redress when terminated for refusing to perform an illegal act. We hold that an attorney's status as in-house counsel does not preclude the attorney from maintaining a claim for wrongful termination under *Sabine Pilot* if the claim can be proved without any violation of the attorney's obligation to respect client confidences and secrets.

### B. Can Willy's claim be proved without violating his ethical obligation to Coastal?

■ Coastal asserts that Willy's claim is barred because he could not prove it without breaching his ethical obligations to Coastal. The rule governing preservation of a client's confidences and secrets that was in effect at the time Willy brought his suit[5] provides in part:

(A) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.
(B) Except when permitted under DR 4–101(C), a lawyer shall not knowingly:
(1) Reveal a confidence or secret of his client.
(2) Use a confidence or secret of his client to the disadvantage of the client.
(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

(C) A lawyer may reveal:
(1) Confidences or secrets with the consent of the client or clients affected, but only after a full disclosure to them.
(2) Confidences or secrets when permitted under Disciplinary Rules or required by law or court order.
(3) The intention of his client to commit a crime and the information necessary to prevent the crime.
(4) Confidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct.

DR 4–101(C)(3) permits disclosure of confidential information to *prevent* a client from committing a crime. However, Willy's intention is to use client confidences to prove he was wrongfully terminated, not to prevent Coastal from committing a crime in the future.

DR 4–101(C)(4) provides that a lawyer could reveal "[c]onfidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct." The rule does not provide that an attorney could reveal client confidences and secrets when necessary to prove a claim against the client.[6]

Willy has provided no authority, and we can find none, to support his assertion that he is entitled to reveal confidential information in order to prove his claim of wrongful termination. We have held that Willy can maintain a suit for wrongful termination only if his claim can be proved without any violation of his ethical obligation to respect client confidences and secrets. That obligation is defined by the Code, which contains no ex-

---

5. The Code of Professional Responsibility (the Code) was replaced by the Texas Disciplinary Rules of Professional Conduct on January 1, 1990. Prior to that date, the disclosure of a client's confidences and secrets was governed by State Bar Rules, art. 10, § 9, DR 4–101 (Texas Code of Professional Responsibility).

6. The current Rules provide in part that a lawyer may reveal confidential information "[t]o the extent necessary to enforce a claim or establish a defense on behalf of the lawyer in a controversy between the lawyer and the client." Tex. Disciplinary R. Prof. Conduct 1.05(c)(5). The comments to rule 1.05 suggest that this provision applies in situations in which a lawyer is attempting to collect a fee.

ception that allows the revelation of Coastal's confidences and secrets in this context.

Accordingly, we sustain Coastal's first point of error. In light of our disposition of Coastal's first point of error, we need not address its remaining points, and decline to do so.

### Willy's point of error

In his sole point of error, Willy contends the trial court erred by refusing to award him prejudgment interest. Because of our disposition of Coastal's point of error, Willy is not entitled to recover damages for wrongful termination from Coastal. Therefore, his claim for prejudgment interest necessarily fails.

We overrule Willy's sole point of error.

We reverse the judgment of the trial court, and render judgment for Coastal.