Brian F. **KIDWELL,** Respondent,

v.

**SYBARITIC, INC.,** Appellant.

Nos. A07–0584, A07–0788.

Court of Appeals of Minnesota.

June 3, 2008.

James H. Kaster, Sofia B. Andersson, Nichols, Kaster & Anderson, P.L.L.P., Minneapolis, MN, for respondent.

Katherine A. McBride, James R. Roegge, Bradley J. Lindeman, Erica G. Strohl, Meagher & Geer, P.L.L.P., Minneapolis, MN, for appellant.

Considered and decided by JOHNSON, Presiding Judge; LANSING, Judge; and COLLINS, Judge.*

## OPINION

JOHNSON, Judge.

Brian F. Kidwell was the general counsel of Sybaritic, Inc., for approximately ten months. The company terminated his employment three weeks after he sent an e-mail message to Sybaritic's top management expressing his concerns about certain activities of the company that he asserted were unlawful. After his termination, Kidwell sued Sybaritic under the Minnesota Whistleblower Act. A Hennepin County jury found in his favor and awarded him damages. Following the verdict, Sybaritic moved for judgment as a matter of law, and the district court denied the motion.

---

\* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

Sybaritic's appeal presents questions concerning whether and under what circumstances an attorney who was discharged from employment as an in-house attorney may pursue a claim against his former employer under the Minnesota Whistleblower Act. Sybaritic first urges us to hold that an in-house attorney never may sue his or her former employer under the whistleblower act. We reject that argument and conclude that there is no per se bar to a lawsuit under the whistleblower act by an in-house attorney. Sybaritic also argues that Kidwell's communications with Sybaritic's management were not the type of communication that can be the basis of an action under the whistleblower act. We find merit in Sybaritic's second argument and conclude that Kidwell did not make a good-faith report of a violation of law because the alleged report concerned subject matters that were squarely within his duties as general counsel. Thus, we reverse the district court's denial of Sybaritic's post-trial motion for judgment as a matter of law.

## FACTS

### A. Background

Brian F. Kidwell is an attorney who was admitted to the Minnesota Bar in 1983. He has work experience in private practice at three Minnesota law firms and had a brief tenure at an insurance company. Sybaritic, Inc., is a Minnesota company that manufactures and sells products associated with the spa business, such as dermabrasion systems and skin-care treatments. In July 2004, Sybaritic hired Kidwell to be its general counsel.

During his tenure as general counsel of Sybaritic, Kidwell served as legal advisor to the company with respect to, among other issues, four business practices that he believed raised legal issues and required corrective action. First, soon after Kidwell started at Sybaritic, the owner of the company, Steve Daffer, asked Kidwell to investigate whether some members of the company's sales force were receiving kickbacks from a company that did business with Sybaritic. Kidwell investigated and found that three sales people were, in fact, receiving kickbacks. In late 2004 or early 2005, Kidwell informed Daffer of the results of the investigation. Daffer placed the employees on probation and required them to return the money they had received.

Second, in late 2004, Kidwell became concerned that Sybaritic's medical director was engaging in the unauthorized practice of medicine. The medical director was licensed to practice medicine in a foreign country but not in Minnesota or any other state. Yet Sybaritic's website referred to the medical director as a physician, and the medical director was engaged in tests on human subjects using machines sold by Sybaritic. The medical director also wrote weekly articles that, in Kidwell's opinion, could be construed as medical advice. In October 2004 and January 2005, Kidwell expressed his concerns in memoranda addressed to Sybaritic's management, and he later met with Sybaritic's chief operating officer to discuss the issue. The company agreed to implement Kidwell's recommendations. The weekly articles stopped immediately, although Kidwell did not inquire further as to whether Sybaritic followed all his recommendations.

Third, Kidwell learned that Sybaritic may have been required to pay California sales tax on items sold and shipped from its Minnesota office because it maintained a California branch office. Kidwell was asked to prepare documents to make the California branch office a limited liability company called Sybaritic West LLC, which would be a subsidiary of Sybaritic.

In early 2005, Kidwell noticed that Sybaritic's website continued to list Sybaritic West as a "branch office." Kidwell raised the issue again and was told that the website would be changed. Kidwell did not investigate further to determine whether the change was made.

Fourth, and most significant for purposes of Kidwell's claim, Sybaritic filed a lawsuit in federal court against an Estonian company named NeoQi, alleging breach of contract and theft of trade secrets. Kidwell's responsibilities included oversight of this litigation. In addition, to minimize attorney fees, Daffer asked Kidwell, in lieu of Sybaritic's outside litigation counsel, to take depositions in Estonia in April 2005. As he was preparing for the depositions, Kidwell became aware of e-mails that, in his opinion, substantially weakened the merits of Sybaritic's claims against NeoQi. Sybaritic had not produced the e-mails to NeoQi, which had not yet requested them, but discovery deadlines were looming. Before leaving for Estonia, Kidwell talked to Daffer about the content of the e-mails. Daffer asked Kidwell why Sybaritic should be concerned in light of the fact that the e-mails had not been requested by or produced to NeoQi and, thus, were unlikely to be admitted into evidence. Kidwell, however, advised Daffer to take the e-mails into account and to consider settling the case.

Kidwell testified that, before leaving for Estonia, he asked Sybaritic's information-technology manager, Brandon Carlson, to put copies of the e-mails on a disk for Thomas C. Atmore, Sybaritic's outside litigation counsel. Carlson, however, testified that it was Daffer who made the request. Regardless, Carlson gave a disk containing the e-mails to Atmore. While Kidwell was in Estonia, Daffer perceived a problem with his computer and became concerned that there was a virus in Sybaritic's computer system. He also was concerned that the virus might have infected the disk that had been given to Atmore. Daffer instructed Carlson to retrieve the disk from Atmore and to give Atmore another disk that would be free of viruses. Atmore told Carlson that the exchange was unnecessary because his firm had anti-virus software, but Carlson insisted on Atmore's return of the disk. The company ultimately determined that there was no computer virus, and Atmore testified that, as far as he could determine, no e-mails were missing from the second disk.

After Atmore returned the first disk, and while Kidwell was in Estonia, the two men spoke by telephone, and Atmore expressed concern about the request that he return the disk. Atmore reminded Kidwell of Sybaritic's duty to preserve the e-mails. Atmore suggested that he write a letter to Daffer to warn him about the duty to preserve evidence. Kidwell asked Atmore to send the letter to him instead, which Atmore did. Additionally, Kidwell spoke with Jeff Nelson, Daffer's administrative assistant, about his and Atmore's concerns that Daffer might be altering, destroying, or concealing evidence. Nelson conveyed Kidwell's concerns to Carlson, and Carlson spoke to Daffer, who assured Carlson that no one was tampering with evidence.

## B. Kidwell's Termination

Kidwell returned from Estonia on Friday, April 22, 2005. That Sunday, Kidwell went to his office but discovered that the door was locked. He did not have a key. That evening, while at home, Kidwell composed and sent a long e-mail message to four members of Sybaritic's senior management. The subject line reads, "A Difficult Duty." The first three paragraphs of the e-mail are as follows:

Gentlemen,

I write to you all with deep regret, but I cannot fail to write this e-mail without also failing to do my duty to the company and to my profession as an attorney. That I will not do.

I have for many months seen evidence that Sybaritic is infected with a pervasive culture of dishonesty. In this culture lies by our salesforce are rewarded with bonuses and promotions while accusations by customers of dishonesty by salespeople known to be liars are ignored. In this culture a man who is without any known qualifications is allowed to mascquerade [sic] as a medical doctor and efforts to confirm his credentials and curb his unauthorized practice of medicine are ignored. In this culture we deny any obligation to collect or pay California sales tax based on a claim that we do not do business in California and then advertise the opening of a San Francisco "branch office" on our website. In this "sales-driven" company, the ends justify the means.

As distasteful as this culture of dishonesty is to me, to my shame I have until now convinced myself that I did not need to object because the dishonesty was outside of my area of responsibility or control. That has now changed, and I must inform you of this fact and of my intended course of action.

Kidwell then detailed his concerns regarding the NeoQi e-mails, explaining that Sybaritic could be held liable for sanctions under rules 11 and 37(b) of the Federal Rules of Civil Procedure and held criminally liable under sections 401, 1509, and 1512 of title 18 of the United States Code. Kidwell concluded the e-mail with his intended course of action:

It is my firm conviction that Sybaritic intends to continue to engage in tax evasion, the unauthorized practice of medicine and obstruction of justice. Ac-

cordingly, it is my intention to advise the appropriate authorities of these facts. I do this with no ill-will. To the contrary, I wish that I was not obliged to do so. However, the demand of Sybaritic that I become attorney of record in the NeoQi case has made it impossible to ignore the obstruction of justice issue, and compels me to speak out about the tax evasion and unauthorized practice of medicine issues which the company has refused to address. I regret that I see no other course of action available.

Kidwell also sent a blind copy of the e-mail to Atmore, and he later forwarded the e-mail to his father, who was not a Sybaritic employee. Kidwell testified at trial that he conducted legal research concerning the Minnesota Whistleblower Act from his home computer before sending the e-mail.

On the morning of Monday, April 25, 2005, members of Sybaritic's management team met by themselves and with Kidwell to discuss the contents of the e-mail. Before the end of the day, supervision of Kidwell was transferred from Daffer to Steve Chesley, another member of the management team. Three weeks later, on May 16, 2005, Chesley informed Kidwell that his employment was being terminated because he obviously was not happy with the job and because Daffer was not happy with Kidwell. Sybaritic's reasons for the termination did not remain consistent over time. During pre-trial discovery, Sybaritic stated that Kidwell's employment was terminated because of his failure to complete assignments, because of his "request for one week vacation on less than one week's notice," which "coincided with previously scheduled depositions to occur in a pending arbitration involving Sybaritic, Inc.," and because "Sybaritic, Inc. was not confident nor trusted that Kidwell was able to complete his duties as General Counsel in

a satisfactory manner." At trial, Sybaritic contended that Kidwell's employment was terminated for performance reasons and because he breached his fiduciary duty by forwarding a copy of the difficult-duty e-mail to his father.

## C. Procedural History of Lawsuit

After his termination, Kidwell commenced this lawsuit, alleging he was terminated in violation of the Minnesota Whistleblower Act. Sybaritic counterclaimed for breach of fiduciary duty based on Kidwell's forwarding the difficult-duty e-mail to his father. Both parties moved for summary judgment, which the district court denied. Kidwell also moved for leave to amend his complaint to allege punitive damages, which the district court denied.

The case was tried to a Hennepin County jury for seven days in September and October of 2006. The district court gave the following instruction to the jury concerning what type of conduct is protected activity under the whistleblower act:

Protected activity is an employee's conduct in making a good faith report of an actual or suspected violation of a state or federal law to an employer or to any governmental body or law enforcement official.

An employee engages in a protected activity under the act if the purpose of the employee's report to the employer or an outside governmental agency was to blow the whistle for the purpose of exposing an illegality that is a violation of a federal, state or local law.

In order to establish that he made a protected report for purpose of the Minnesota Whistleblower Act, Brian Kidwell is required to allege facts that if proven constitute a current violation of law.

An employee does not engage in protected activity unless he made a report in good faith. To determine whether a report was made in good faith, you must look not only at the content of the report, but also at Mr. Kidwell's *job and* purpose in making the report at the time the report was · made, not after subsequent events have transpired.

(Emphasis added.) The district court rejected one of Sybaritic's proposed jury instructions that read: "An employee does not engage in a protective activity if it was the employee's job to bring to the employer's attention or the attention of any governmental agency any activities that the employee in good-faith believed were in violation of any federal, state or local law." In lieu of this proposed instruction, but in an attempt to address the same issue, the district court inserted the words "job and" at the point where those words are italicized above. The district court also rejected an instruction proposed by Sybaritic that read: "An employee does not engage in a protective activity if he reports alleged violations of law that were already known by the employer."

The jury completed a special verdict form by finding that Kidwell had engaged in conduct protected by the whistleblower act, that he had done so in good faith, and that his conduct was a substantial motivating factor in Sybaritic's termination decision. The jury awarded Kidwell $65,000 in back pay, $120,000 in front pay, and $12,000 for emotional distress. The district court instructed the jury that Kidwell had breached his fiduciary duty, but the jury found that Sybaritic had suffered no damages as a result of the breach.

Sybaritic brought a post-trial motion for judgment as a matter of law or, in the alternative, a new trial, which the district court denied. The district court filed findings of fact and conclusions of law and ordered judgment in Kidwell's favor in the amount of $197,000. The district court

also awarded Kidwell attorney fees of approximately $138,000 and costs and expenses of approximately $10,000.

Sybaritic appeals, making five arguments: (1) Kidwell's whistleblower claim is barred because he is an attorney suing his former client; (2) the evidence is insufficient to prove a whistleblower claim because Kidwell did not engage in conduct protected by the act; (3) Kidwell is required to disgorge some or all of the damages awarded to him because of his breach of fiduciary duty; (4) the district court's jury instructions were erroneous; and (5) the district court erroneously admitted various types of inadmissible evidence. Kidwell filed a notice of review to address one issue, the denial of his motion to amend his complaint to seek punitive damages.

## ISSUES

I. May a person who was discharged from employment as an in-house attorney maintain an action against his former employer under the Minnesota Whistleblower Act?

II. Did Kidwell, an attorney employed by Sybaritic as its general counsel, present evidence sufficient to prove that he in good faith reported a violation or suspected violation of law, as required by the Minnesota Whistleblower Act?

## ANALYSIS

 Sybaritic appeals from the district court's denial of its post-trial motion for judgment as a matter of law pursuant to rule 50.02 of the Minnesota Rules of Civil Procedure. Judgment as a matter of law is appropriate when a jury's verdict has no reasonable support in fact or is contrary to law. *Diesen v. Hessburg*, 455 N.W.2d 446, 452 (Minn.1990). The denial of a motion for judgment as a matter of law presents a legal question, which is subject to de novo review. *Gilbertson v. Leininger*, 599 N.W.2d 127, 130 (Minn. 1999).

## I.

 Sybaritic first argues that Kidwell's whistleblower claim is barred as a matter of law on the ground that an in-house attorney never may bring such a claim against a former employer. Sybaritic's argument is based on the traditional rule that a client may discontinue an attorney-client relationship at any time, with or without cause, and without penalty, *see Lawler v. Dunn*, 145 Minn. 281, 283, 176 N.W. 989, 989 (1920), and on the premise that a lawsuit by an attorney against a former client would be inherently inconsistent with an attorney's duty to not reveal client confidences, *see* Minn. R. Prof. Conduct 1.6. In some jurisdictions, this doctrine is known as "the attorney-client defense." *See, e.g., Balla v. Gambro, Inc.*, 145 Ill.2d 492, 164 Ill.Dec. 892, 584 N.E.2d 104, 108 (1991) (holding that former in-house attorney's common-law tort claim of retaliatory discharge was barred); *Ausman v. Arthur Andersen, LLP*, 348 Ill. App.3d 781, 284 Ill.Dec. 776, 810 N.E.2d 566, 570–72 (2004) (applying *Balla* ).

The parties' legal arguments focus on two Minnesota cases in which this issue was discussed. The first is *Nordling v. Northern States Power Co.*, 478 N.W.2d 498 (Minn.1991), in which the supreme court considered a lawsuit brought by a former in-house attorney whose employment had been terminated. *Id.* at 499–500. The plaintiff brought claims based on contract and tort theories and on the whistleblower act, and the district court granted summary judgment on all claims. After extensive discussion of the nature of the attorney-client relationship, the supreme court held that "in-house counsel should not be precluded from maintaining

an action for breach of a contractual provision in an employee handbook, provided, however, that the essentials of the attorney-client relationship are not compromised." *Id.* at 502.

With respect to the whistleblower claim, however, the supreme court commented that a "retaliatory discharge claim is more likely to implicate the attorney-client relationship, raising issues not only of divulging client confidences, but confidences that relate to client wrongdoing." *Id.* at 504. But the supreme court stopped short of either adopting or rejecting a per se bar to a whistleblower claim, stating, "Any further discussion of the attorney-client defense here, however, would be academic because we agree with the trial court that as a matter of law there was no violation of the whistleblower statute." *Id.* The court proceeded to affirm the district court on the ground that the plaintiff had failed to "identify any federal or state law or rule that was violated or suspected of being violated." *Id.*

The second Minnesota case on point is *Michaelson v. Minnesota Mining & Mfg. Co.*, 474 N.W.2d 174 (Minn.App.1991), *aff'd mem.*, 479 N.W.2d 58 (Minn.1992). Michaelson also was an in-house attorney who sued his employer, alleging contract claims, tort claims, and a whistleblower claim. *Id.* at 177. On Michaelson's appeal from summary judgment, 3M's first responsive argument was that an attorney is barred from bringing any claims against a former client. *Id.* at 178. The district court had not addressed the issue of a per se bar, even though it was raised by the defendant in the district court. *Id.* at 177. This court appears to have held that at least some of the plaintiff's claims were per se barred, stating:

> Respondent here argues that appellant was respondent's attorney and as such may not raise claims against respondent for events which arose during their attorney-client relationship. We agree. An attorney cannot properly bring a lawsuit against his client and transform confidential data generated in the course of representation into evidence against his client. Such conduct subverts the attorney-client privilege as well as the well-established principle that, as between an attorney and client, the power to terminate or modify the relationship must remain with the client.

*Id.* at 178. Despite this seemingly clear language, the court nonetheless stated: "However, because of the trial court's ruling, we move on to consider appellant's contention that the trial court [erred] when it granted summary judgment for respondent." *Id.* This court then disposed of the whistleblower claim on the merits by identifying several reasons why the plaintiff's evidence was insufficient. *Id.* Thus, although the issue raised by Sybaritic in this case was raised by the defendant in *Michaelson* and given favorable consideration, it appears that this court based its decision on the merits of the claim.

Even if this court had held in *Michaelson* that a former attorney-employee is barred from bringing any employment-related claims against a former client-employer, the bases of that holding no longer would be as solid as when the decision was issued, for two reasons. First, the *Michaelson* court relied to a significant extent on this court's decision in *Nordling v. Northern States Power Co.*, 465 N.W.2d 81 (Minn.App.1991), *rev'd*, 478 N.W.2d 498 (Minn.1991), which had held only six months earlier that a per se bar applied. *Id.* at 86. But five months after this court's decision in *Michaelson*, the supreme court reversed this court's decision in *Nordling* and held that there was no per se bar to the contract claim. 479 N.W.2d 58. Kidwell argues that the supreme

court in *Nordling* "overruled" *Michaelson* to the extent that *Michaelson* may have imposed a per se bar. That is too strong a statement. But the supreme court's decision in *Nordling* did cast significant doubt on *Michaelson's* favorable discussion of the attorney-client defense. Sybaritic, on the other hand, argues that the supreme court's summary affirmance of *Michaelson* one month after its decision in *Nordling* indicates that the supreme court approved of this court's reasoning in *Michaelson. See* 478 N.W.2d 498. But a summary affirmance by the supreme court has "no precedential value because [it does] not commit the court to any particular point of view" other than to resolve the dispute between those parties. *Hoff v. Kempton,* 317 N.W.2d 361, 366 (Minn.1982). The supreme court has had two opportunities to decide the issue but has declined to do so each time.

Second, the *Michaelson* court's discussion of this issue was based in significant part on the principle that "[a]n attorney cannot properly bring a lawsuit against his client and transform confidential data generated in the course of representation into evidence against his client" because "[s]uch conduct subverts the attorney-client privilege." 474 N.W.2d at 178. But this premise may no longer be valid because of a 2005 amendment to the Minnesota Rules of Professional Conduct, which now permit a lawyer to reveal confidential information in ways that were not permitted at the time of the *Michaelson* decision:

> A lawyer may reveal information relating to the representation of a client if:
>
> . . . .
>
> (8) *the lawyer reasonably believes the disclosure is necessary to establish a claim or defense on behalf of the lawyer in an actual or potential controversy between the lawyer and the client,* to establish a defense in a civil, criminal, or

disciplinary proceeding against the lawyer based upon conduct in which the client was involved, or to respond in any proceeding to allegations by the client concerning the lawyer's representation of the client. . . .

Minn. R. Prof. Conduct 1.6(b) (emphasis added). An ABA advisory ethics opinion stated the view that the model rule (which corresponds to the current version of the Minnesota rule) would apply to an in-house attorney's retaliation claim against a former employer. The advisory opinion concludes:

> The Model Rules do not prevent an in-house lawyer from pursuing a suit for retaliatory discharge when a lawyer was discharged for complying with her ethical obligations. *An in-house lawyer pursuing a wrongful discharge claim* must comply with her duty of confidentiality to her former client and *may reveal information to the extent necessary to establish her claim against her employer.* The lawyer must take reasonable affirmative steps, however, to avoid unnecessary disclosure and limit the information revealed.

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. No. 01–424 (2001) (emphasis added), *reprinted in ABA/BNA Lawyers' Manual on Prof'l Conduct* 1201:112,:115 (2001). We do not necessarily endorse the conclusion reached in the advisory opinion; we merely note that the 2005 amendment to Minn. R. Prof. Conduct 1.6(b) may have altered the analysis that was prescribed by the *Michaelson* court.

Sybaritic urges us to adopt the reasoning of a few foreign cases that have applied a per se bar to lawsuits brought by former in-house attorneys. *See, e.g., Balla,* 164 Ill.Dec. 892, 584 N.E.2d at 108. The majority view, however, appears to reject the attorney-client defense and to permit such

claims, though sometimes with the proviso that in-house attorneys may pursue such claims so long as they do not run afoul of the duty of confidentiality (a proviso that potentially could be applied as a bar). *See, e.g., Crews v. Buckman Labs. Int'l, Inc.,* 78 S.W.3d 852, 857, 863–64 (Tenn.2002) (holding that in-house attorney may sue for retaliatory discharge in violation of public policy, subject to applicable confidentiality restrictions); *General Dynamics Corp. v. Superior Court,* 7 Cal.4th 1164, 32 Cal. Rptr.2d 1, 876 P.2d 487, 490 (1994) (holding that in-house attorney may sue for retaliatory discharge in violation of public policy unless suit cannot proceed without breach of attorney-client privilege); *see also Heckman v. Zurich Holding Co.,* 242 F.R.D. 606, 608–09 (D.Kan.2007) (citing additional cases). Almost all of the cases cited to us, however, are concerned with common-law retaliation claims. It appears that only one other court has considered the issue in the context of a statutory whistleblower claim, and that court declined to adopt a per se bar. *See Parker v. M & T Chem., Inc.,* 236 N.J.Super. 451, 566 A.2d 215, 220–21 (1989). The distinction is meaningful because Minnesota courts tend to avoid judicially created conditions or exceptions to the statutory language of the whistleblower act. *See Anderson–Johanningmeier v. Mid-Minnesota Women's Ctr., Inc.,* 637 N.W.2d 270, 277 (Minn.2002) ("reject[ing] the importation of a public policy requirement into the whistleblower statute and hold[ing] that the protections of section 181.932, subd. 1(a), are not limited to reports that implicate public policy").

In sum, in light of the absence of clear, binding authority supporting Sybaritic's argument, we hold that Kidwell's whistleblower claim is not per se barred by the so-called attorney-client defense.

## II.

▮ Sybaritic next argues that Kidwell did not engage in conduct that triggered the protections of the whistleblower act. The act provides that "[a]n employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee" because the employee "in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." Minn.Stat. § 181.932, subd. 1(a) (Supp.2007). The elements of proof at trial are essentially the same as the elements of a prima facie case. First, the plaintiff must prove that he engaged in statutorily protected conduct. Second, the plaintiff must prove that he was subjected to an adverse employment action. And third, the plaintiff must prove a causal connection between the statutorily protected conduct and adverse employment action. *Gee v. Minnesota State Colls. & Univs.,* 700 N.W.2d 548, 555 (Minn.App. 2005). The plaintiff carries the ultimate burden of persuasion on each element of proof. *Grundtner v. University of Minn.,* 730 N.W.2d 323, 329 (Minn.App.2007).

There is no question that Kidwell proved the second element. In addition, Sybaritic has not challenged the sufficiency of the evidence establishing the third element. Thus, Sybaritic's argument focuses on the first element. Kidwell's theory at trial was that his difficult-duty e-mail constituted statutorily protected conduct. Sybaritic makes three arguments why the difficult-duty e-mail does not constitute protected activity under the whistleblower act.

## A. Violation of Law

Sybaritic argues that Kidwell did not engage in protected activity because he did not prove "that any law had been broken"

or that "there was even the threat that an illegality was about to happen." The act protects an employee who "reports a violation or suspected violation" of a law or rule. Minn.Stat. § 181.932, subd. 1(a). The report must include "facts that, if proven, would constitute a violation of law or rule adopted pursuant to law." *Abraham v. County of Hennepin*, 639 N.W.2d 342, 355 (Minn.2002). "While there need not be an actual violation of law, the reported conduct must at least implicate a violation of law." *Obst v. Microtron, Inc.*, 614 N.W.2d 196, 200 (Minn.2000). It is not necessary, however, for the report to identify the specific law or rule suspected of being violated, so long as there is a state or federal law or rule that is implicated by the employee's report. *Abraham*, 639 N.W.2d at 354–55.

■ In response, Kidwell first argues that Sybaritic did not preserve this issue in the district court. Kidwell is correct; Sybaritic did not make this argument in its post-trial motion for judgment as a matter of law. Sybaritic did argue to the district court that Kidwell's alleged report is not protected because it contained information of which Sybaritic already was aware. That argument raises a separate issue, which is considered below in part II.C. But Sybaritic has waived the argument that Kidwell's report did not state facts that would make out a violation of law. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988). Accordingly, we will assume without deciding that Kidwell "report[ed] a violation or suspected violation" of law or rule adopted pursuant to law, Minn.Stat. § 181.932, subd. 1(a), and that his report contained "facts that, if proven, would constitute a violation" of such a law or rule, *Abraham*, 639 N.W.2d at 355.

## B. Report Within Scope of Duties

■ Sybaritic also argues that the alleged report on which Kidwell's claim is based—the difficult-duty e-mail message— is not protected by the act because Kidwell merely was fulfilling his duties as the company's in-house attorney when he composed and sent the message.

This argument can be resolved by a straightforward application of this court's precedent. In two prior cases, this court clearly has held that a former employee may not maintain an action under the whistleblower act if the alleged report is a communication that was made to fulfill the employee's job responsibilities. In *Michaelson*, the whistleblower claim was alleged by a former in-house attorney who had responsibility for employment-law issues. 474 N.W.2d at 177. The whistleblower claim was based on "several instances in which [Michaelson] investigated problems which arose from [the company's] employment practices. Although [Michaelson] advised [the company] on the proper steps to resolve the problems, [the company] often did not follow [Michaelson's] advice." *Id.* at 180. This court affirmed the grant of summary judgment to the employer on several independent, alternative grounds. One of those independent grounds was that Michaelson "did not 'report' conduct, but rather gave his supervisor feedback, based upon his legal analysis, regarding proper proposed business decisions." *Id.*

More recently, in *Grundtner*, an architect objected to his employer's proposed plan to negotiate a contract for a construction project in a way that would have violated the law. 730 N.W.2d at 326. After Grundtner voiced his concerns to his supervisor, the employer did not follow through on the proposed plan. This court affirmed the district court's grant of summary judgment in part because "[i]t was [Grundtner's] job ... to ensure that the university did not engage in improper pro-

curement methods." *Id.* at 330. The court referred to Grundtner's duties because, as the court explained in a parenthetical, a plaintiff does "not have a whistleblower claim when her stated purpose in reporting was to fulfill her responsibilities." *Id.* (citing *Gee*, 700 N.W.2d at 556 (affirming summary judgment where plaintiff made alleged report "not with the purpose of exposing an illegality, but to contradict" information provided by supervisor during decisionmaking process)).

It is worth noting that the federal courts have interpreted the act in the same manner. In *Skare v. Extendicare Health Servs., Inc.*, 515 F.3d 836 (8th Cir.2008) (Murphy, J.), the United States Court of Appeals for the Eighth Circuit stated, "The whistleblower statute does not grant protection to an employee whose job duties require him or her to ensure legal compliance." *Id.* at 841. The Eighth Circuit affirmed summary judgment for the former employer because "the nature of Skare's internal complaints was to carry out her regular job duties as opposed to exposing wrongdoing." *Id.* Similarly, in *Freeman v. Ace Tel. Ass'n*, 404 F.Supp.2d 1127 (D.Minn.2005), *aff'd* 467 F.3d 695 (8th Cir.2006), the United States District Court for the District of Minnesota stated, "A report that is presented as part of an employee's job duties is not a report under the Act." *Id.* at 1139.

Thus, *Michaelson* and *Grundtner* hold that an employee does not engage in protected conduct under the whistleblower act if the employee makes a report in fulfillment of the duties of his or her job. This rule is in harmony with the statutory requirement of "good faith," Minn.Stat. § 181.932, subd. 1(a), and the caselaw instructing that "to determine whether a report … is made in good faith, we must look not only at the content of the report, but also at the reporter's purpose in mak-ing the report." *Obst*, 614 N.W.2d at 202. In determining a "reporter's purpose," the "central question is whether the reports were made for the purpose of … expos[ing] an illegality." *Id.* The caselaw essentially presumes that when an employee performs the duties of his or her job, the employee acts not with the purpose of exposing an illegality but, rather, only with the purpose of promoting the employer's interests. *Cf. Sanitary Farm Dairies, Inc. v. Wolf*, 261 Minn. 166, 176, 112 N.W.2d 42, 49 (1961) (discussing employee's duty of loyalty and exploring "line … between preparation for a change in employment and outright disloyalty to the employer"). In this way, the rule is consistent with an attorney's most basic duties to his or her client—to be competent, to be diligent, to use good judgment, to render candid advice, and to avoid conflicts of interest. *See* Minn. R. Prof. Conduct 1.1, 1.3, 1.7(a)(2), 2.1. If a contrary rule were to govern, an in-house attorney might engage in protected activity every day because attorneys routinely work with laws and rules and routinely consider violations and suspected violations of laws and rules.

Applying the precedent to this case, the evidence establishes that Kidwell wrote the difficult-duty e-mail to fulfill the duties of his position. He was the company's general counsel, a position typically (though not always) vested with overall responsibility for all legal matters. He sent the e-mail to the company's top executives, including the owner and president, who was his direct supervisor. Kidwell's written employment agreement states that his duties include "responsibility and decisions as to all corporate legal matters, and the general legal administration of activities at Sybaritic." The agreement also makes express reference to the NeoQi lawsuit, and Kidwell was playing an active role in that lawsuit. All of the issues raised in the difficult-duty e-mail were

matters about which Kidwell previously had advised the company, and Kidwell apparently was the only attorney employed by the company. More specifically, Kidwell's own words demonstrate conclusively that he wrote and sent the difficult-duty e-mail to fulfill his job responsibilities. In the e-mail itself, he wrote, "I cannot fail to write this e-mail without also failing to do my duty to the company and to my profession as an attorney. That I will not do." And at trial, he testified that he sent the difficult-duty e-mail "[b]ecause I hoped that we could pull this company back into compliance by enlisting some of the other members of management, and as the person responsible for the legal affairs of the company, that's what I had to do." [1]

Kidwell argues that the difficult-duty e-mail is protected by the whistleblower act because he "went beyond the scope of his job duties." But this argument is inconsistent with the evidence recited above, which shows that Kidwell himself believed the e-mail to be within the scope of his duty to his client and employer. Kidwell also points out that he wrote the difficult-duty e-mail "outside of regular business hours, on his own time, and not in the normal course of business." This argument does not negate the evidence recited above. Furthermore, the argument is inconsistent with the reality that an attorney's work is not necessarily limited in space and time to a law office or the traditional workweek. Kidwell also attempts to distinguish this case from *Michaelson* by saying that the plaintiff in that case gave "feedback" while he "made an unambiguous report that the company was intentionally violating the law, and he threatened to go to the authorities." This is a distinction without a difference. The operative facts of the two cases are indistinguishable; in each case, an in-house attorney provided legal advice to his employer, and the employer took adverse employment action (or was alleged to have done so) based on the advice.

Thus, as a matter of law, Kidwell's difficult-duty e-mail does not constitute protected conduct under the whistleblower act because he wrote and sent the difficult-duty e-mail in fulfillment of the duties of his position of employment. Consequently, Kidwell's evidence was insufficient to prove a whistleblower claim.[2]

1. The dissent relies on the California Supreme Court's comparisons of attorneys in private practice and attorneys in corporate law departments. *See infra* at D–1. We are not confident that those views are an accurate description of today's legal workforce. Various observers have reported that in-house counsel now are considerably more mobile than in prior years, with a greater tendency to move between in-house positions and to move back and forth between private practice and corporate positions. *See, e.g.,* Molly McDonough, *Moving Targets,* A.B.A. J., Dec. 2006, at 20. Kidwell himself went from private practice to an insurance company and back to private practice again before joining Sybaritic in the 21st year of his legal career. Meanwhile, an attorney in private practice may be just as likely as an in-house attorney to have a long-term relationship with a corporation, which creates a different type of dependence for outside counsel. Thus, it is not clear that the "pressures to conform to organizational goals," *General Dynamics Corp. v. Superior Court,* 7 Cal.4th 1164, 32 Cal.Rptr.2d 1, 876 P.2d 487, 491–92 (1994), are greater for in-house attorneys. The California case raises interesting questions, but it is unnecessary to resolve them here. In short, we do not believe that the views of the California Supreme Court should cause this court to depart from its precedent.

2. Because of the resolution of this issue, we need not resolve Sybaritic's argument that the district court improperly instructed the jury. But the instructions should not receive the benefit of any doubt. The instructions ignored Sybaritic's theory of the defense because they did not incorporate the rule that an in-house attorney does not engage in protected conduct if an alleged report is a communication made to the client-employer in fulfillment of the attorney-employee's job re-

## C. Report of New Information

■ Sybaritic also argues that the difficult-duty e-mail is not protected conduct because Sybaritic already knew about each of the issues raised in the e-mail. This argument goes to the statutory requirement that a whistleblower make a report "in good faith." *See* Minn.Stat. § 181.932, subd. 1(a). The supreme court has stated:

> Under the whistle-blower statute, establishing that an employee reported violations or suspected violations of law to his or her employer does not end the inquiry. The critical question of whether those reports were made in good faith must also be answered. In order to determine whether a report of a violation or suspected violation of law is made in good faith, we must look not only at the content of the report, but also at the reporter's purpose in making the report. The central question is whether the reports were made for the purpose of blowing the whistle, i.e., to expose an illegality. *See* Minn.Stat. § 181.932, subd. 1(a). We look at the reporter's purpose at the time the reports were made, not after subsequent events have transpired.... In part, the rationale for looking at the reporter's purpose at the time the report is made is to ensure that the report that is claimed to constitute whistle-blowing was in fact a report made for the purpose of exposing an illegality and not a

vehicle, identified after the fact, to support a belated whistle-blowing claim.

*Obst,* 614 N.W.2d at 202.

The plaintiff in *Obst* reported to his supervisor that the company was not in compliance with federal regulations governing motor-vehicle safety. The employee purportedly made the report to cause his employer to inform a customer of the employer's non-compliance. But "at the time the reports were made" to the employer, the customer "was well aware that [the employer] was shipping and it was receiving defective" products. *Id.* In addition, at the time of the report, both the employee and the employer knew that the customer was aware of the defective products. The supreme court concluded that "there was no whistle to blow" and that the plaintiff "cannot be said to have been trying to expose what was so openly known and acknowledged" by both the employer and the customer. *Id.* at 203. Thus, based on "the content of [the plaintiff's] reports and his purpose in making" them, the reports "did not constitute good faith reports under the whistle-blower statute." *Id.* In somewhat similar reasoning, this court has held that an employee did not make a "report" by mentioning to the company CEO an issue of which the CEO already was aware and was investigating. *Rothmeier v. Investment Advisers, Inc.,* 556 N.W.2d 590, 593 (Minn.App. 1996), *review denied* (Minn. Feb. 26, 1997); *see also Cokley v. City of Otsego,* 623

sponsibilities. *See, e.g., Kirsebom v. Connelly,* 486 N.W.2d 172, 174 (Minn.App.1992) ("A party is entitled to a jury instruction that sets forth his or her theory of the case if the evidence supports it and if it is consistent with applicable law."). The district court's insertion of the words "job and" did not suffice, and Sybaritic makes a strong argument that those words exacerbated the problem by allowing the jury to find that Kidwell's fulfillment of his general counsel duties made his whistleblower claim stronger. In her closing

argument, Kidwell's counsel skillfully exploited the absence of a meaningful instruction on the issue by presenting a single, very simple question to the jury: "you are charged with deciding whether Brian Kidwell was terminated because of the difficult duty e-mail or whether he was terminated for legitimate reasons." There was no instruction that the jury could have used to conclude that, under the whistleblower act, the difficult-duty e-mail was not an unlawful reason for termination.

N.W.2d 625, 630 (Minn.App.2001) (holding that plaintiff could not base whistleblower claim on report of information that had been disclosed to city council two years earlier), *review denied* (Minn. May 15, 2001).

The evidence is clear that Sybaritic management already was aware of three of the issues mentioned in the difficult-duty e-mail: the kickback scheme, the unauthorized-practice-of-medicine issue, and the issue of California sales tax. In previous months, Kidwell had numerous discussions with Sybaritic executives about those issues, all three of the issues were resolved, and Kidwell did not communicate any new information concerning those three issues in the difficult-duty e-mail. Kidwell explained at trial that he was primarily concerned about the NeoQi e-mails and referred to the three other issues because he "wanted management to understand that my concerns about those [NeoQi] e-mails weren't an isolated concern and that there was a pattern of noncompliance with legal obligations that I felt had to stop for the health of the company." Although *Obst* does not establish an absolute rule, *see* 614 N.W.2d at 203 & n. 5, the evidence in the record of this case, including Kidwell's own testimony, makes clear that when Kidwell prepared the difficult-duty e-mail, he did not include the issues of the kickback scheme, the unauthorized practice of medicine, and California sales tax "for the purpose of . . . expos[ing] an illegality." *Obst*, 614 N.W.2d at 202.

Kidwell's communication of information concerning the NeoQi e-mails must be considered separately. In denying Sybaritic's post-trial motion, the district court reasoned that the e-mail message was the first time that Kidwell had accused Sybaritic of obstructing justice and, thus, the first time that he had identified a violation or suspected violation of law. Kidwell pre-

viously had talked with Daffer about the e-mails and their potential impact on the lawsuit, and in part of that discussion he had advised Daffer to consider the potential benefits of a settlement with NeoQi. But that conversation occurred before Kidwell traveled to Estonia, before Daffer instructed Carlson to substitute the disk that had been sent to Atmore, and before Atmore communicated his spoliation concerns to Kidwell. Not until those events did Kidwell develop a suspicion of a violation of a law or rule—the suspected violation that was communicated to Sybaritic's management in the difficult-duty e-mail. The suspected violation of law related to the NeoQi e-mails that Kidwell expressed in the difficult-duty e-mail had not been communicated earlier but, rather, was communicated to Sybaritic's management for the first time in that e-mail message. Thus, we reject Sybaritic's argument that the difficult-duty e-mail is not protected by the whistleblower act on the ground that the e-mail did not communicate new information.

In sum, for the reasons stated above in part II.B., the district court erred by denying Sybaritic's post-trial motion for judgment as a matter of law.

## DECISION

Kidwell's action against his former employer under the Minnesota Whistleblower Act is not per se barred because he was employed as an in-house attorney. But Kidwell did not engage in conduct protected by the Minnesota Whistleblower Act because he was fulfilling the responsibilities of his position of employment when he sent an e-mail message communicating a suspected violation of law. Thus, the evidence was insufficient to prove a whistleblower claim, and the district court erred by denying Sybaritic's motion for judgment as a matter of law. In light of our

resolution of the second issue raised by Sybaritic, we need not address the remainder of the parties' arguments, which now are moot.

**Reversed.**

LANSING, Judge (dissenting).

In *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 499 (Minn.1991), the supreme court held that in-house attorneys can sue for wrongful discharge. In the course of that decision, the supreme court suggested that in-house attorneys might similarly sue under the whistleblower statute. *Id.* at 504. In today's opinion, however, the majority constructs an exception to the statute that strips an in-house attorney of whistleblower protection for exposing illegalities within the corporate structure. Because this duty-rule exception has no support in the text of the whistleblower statute, I respectfully dissent.

The public-policy considerations that form the general basis for whistleblower protection also apply to in-house attorneys because they face the same pressures as ordinary employees. As Justice Arabian explained for the California Supreme Court, in-house attorneys do not have the economic protection provided by a diverse portfolio of legal work:

> Unlike the law firm partner, who typically possesses a significant measure of economic independence and professional distance derived from a multiple client base, the economic fate of in-house attorneys is tied directly to a single employer, at whose sufferance they serve. Thus, from an economic standpoint, the dependence of in-house counsel is indistinguishable from that of other corporate managers or senior executives who also owe their livelihoods and career goals and satisfaction to a single organizational employer.

> Moreover, the professional relationship between the in-house attorney and the client is not the "one shot" undertaking—drafting a will, say, or handling a piece of litigation—characteristic of the outside law firm. Instead, the corporate attorney-employee, operating in a heavily regulated medium, often takes on a larger advisory and compliance role, anticipating potential legal problems, advising on possible solutions, and generally assisting the corporation in achieving its business aims while minimizing entanglement in the increasingly complex legal web that regulates organizational conduct in our society. This expansion in the scope and stature of in-house counsel's work, together with an inevitably close professional identification with the fortunes and objectives of the corporate employer, can easily subject the in-house attorney to unusual pressures to conform to organizational goals, pressures that are qualitatively different from those imposed on the outside lawyer. Even the most dedicated professionals, their economic and professional fate allied with that of the business organizations they serve, may be irresistibly tempted to cut corners by bending the ethical norms that regulate an attorney's professional conduct.

*Gen. Dynamics Corp. v. Superior Court*, 7 Cal.4th 1164, 32 Cal.Rptr.2d 1, 876 P.2d 487, 491–92 (1994). The *General Dynamics* approach has been adopted by several other states. *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 859–62 (Tenn. 2002); *Burkhart v. Semitool, Inc.*, 300 Mont. 480, 5 P.3d 1031, 1036–39 (2000); *GTE Prods. Corp. v. Stewart*, 421 Mass. 22, 653 N.E.2d 161, 165–68 (1995); *Willy v. Coastal States Mgmt. Co.*, 939 S.W.2d 193, 199–200 (Tex.App.1996). The corporate scandals of the past decade only confirm the need to protect in-house counsel's ability to report illegal conduct.

But I would not resolve this case based on economic analysis or policy. The legislature already addressed those issues when it enacted the whistleblower statute, Minn.Stat. § 181.932 (Supp.2007). We are instead addressing a question of statutory interpretation, which we review de novo. *Educ. Minn.-Osseo v. Indep. Sch. Dist. 279*, 742 N.W.2d 199, 201 (Minn.App.2007), *review denied* (Minn. Feb. 19, 2008). If the statute is unambiguous, we must apply its plain meaning. *Id.*

The whistleblower statute prohibits retaliation against an employee because "the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." Minn. Stat. § 181.932, subd. 1(a). Under the plain terms of the statute, an employee can recover by showing (1) the employee made a report to the employer, (2) the report was made in good faith, (3) the report was of a violation or suspected violation of law, and (4) the employee was retaliated against because of the report. *Id.; see also Hedglin v. City of Willmar*, 582 N.W.2d 897, 902 (Minn.1998) (concluding that whistleblower statute "clearly and unambiguously protects reports made of a violation of any federal or state law or rule adopted pursuant to law").

The majority concludes that Kidwell failed to prove his whistleblower claim because he had a duty as an in-house attorney to report illegal activity. But nothing in the statute supports this limitation. The report need only be made in good faith and report a violation or suspected violation of law. The content and purpose of the report is properly considered within the requirement of good faith. The district court correctly instructed the jury on these elements and the jury made its de-

termination. The majority now overturns that determination by imposing a duty doctrine that supersedes the jury's determination of purpose.

In support of this "duty doctrine," the majority relies on three of this court's cases—*Grundtner v. Univ. of Minn.*, 730 N.W.2d 323 (Minn.App.2007), *Gee v. Minn. State Colls. & Univs.*, 700 N.W.2d 548 (Minn.App.2005) (Lansing, J.), and *Michaelson v. Minn. Mining & Mfg. Co.*, 474 N.W.2d 174 (Minn.App.1991), *aff'd mem.*, 479 N.W.2d 58 (Minn.1992). Although the reports in these cases did involve the plaintiffs' job responsibilities, the decisions all had one simple fact in common: the plaintiffs did not report illegal conduct. *See Grundtner*, 730 N.W.2d at 329–30 (holding that report failed to allege illegal conduct); *Gee*, 700 N.W.2d at 556 (holding that report failed to implicate violation of law and was not made in good faith); *Michaelson*, 474 N.W.2d at 180 (holding that, in giving feedback about proposed business decision, plaintiff did not report conduct that was violation or suspected violation of law). The statute protects whistleblowers, not complainers. But the statute does not create a wholesale exemption for an employee who has, as part of his or her job description, the duty to provide legal advice to the corporation or its management.

I agree with the majority's analysis in the first part of the opinion—that an in-house attorney is not per se barred from bringing a whistleblower suit. I also agree that the evidence, which includes Kidwell's testimony about why he made the report and the contents of the report itself, support the jury's determination that the report was made in good faith. But I do not agree that this court has established or should establish a duty doc-

trine that categorically provides that an in-house attorney, who suffers an adverse employment action for a good-faith report of an illegality, has no protection under the whistle-blower statute because that in-house attorney is employed to provide legal advice. I would affirm the jury's verdict, and I respectfully dissent.